**NATIONAL COAL ASSOCIATION, et al., Plaintiffs,**

**v.**

**Donald P. HODEL, et al., Defendants.**

**Civ. A. No. 83–2985.**

United States District Court, District of Columbia.

Aug. 28, 1985.

Arnold Levy, Jerome H. Simonds, John S. Lopatto, III, Freedman, Levy, Kroll & Simonds, Washington, D.C. (Robert Stauffer, Peter Gabauer, Nat. Coal Ass'n, Washington, D.C., of counsel), and Thomas Altmeyer, Washington, D.C., Mining and Reclamation Council of America, for plaintiffs Nat. Coal Ass'n and Mining and Reclamation Council of America.

Robert D. Daniel, Special Litigation Counsel, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C. (John J. McHale, Atty. Advisor, Energy and Resources, Office of Solicitor, U.S. Dept. of Interior, Washington, D.C., of counsel), for Federal defendants.

Russell H. Carpenter, Jr., Laird Hart, Covington & Burling, Washington, D.C., for defendants Rocky Mountain Energy Co., et al.

## OPINION

HAROLD H. GREENE, District Judge.

This case of first impression concerns the power of the Secretary of the Interior to engage in and approve land exchanges containing coal reserves where the exchange may, at least in part, benefit common carrier railroads. Ultimately, the decision turns, as do so many others in other contexts, on the meaning of the ubiquitous yet elusive phrase "the public interest." The issues are complicated by the fact that the exchanges are sought by three kinds of entities—Princeton University and other eleemosynary institutions; the subsidiary of a railroad empire; and the National Park Service. Opposed to the exchanges are coal mining interests.

### I

Plaintiffs, which are trade associations representing coal mine operators who collectively produce most of the coal mined annually in the United States, brought this action challenging a determination of the Secretary of the Interior issued in 1983 that the so-called "Corral Canyon" land exchange was in the "public interest" and therefore permissible under section 206 of

the Federal Land Policy and Management Act of 1976 (FLPMA).[1] They seek an order (1) enjoining the Secretary and private defendant Rocky Mountain Energy Company to rescind the land exchange, and (2) declaring the Secretary's interpretation and application of section 206 to be contrary to law and invalid. Defendants have moved to dismiss or for summary judgment; plaintiffs have opposed defendants' motions and have cross-moved for summary judgment. After carefully considering the claims asserted by plaintiffs, and the papers and oral arguments submitted by the parties, the Court concludes that plaintiffs' claims lack merit, and it will accordingly grant defendants' motions and order the case dismissed.

## II

The material facts are not in dispute. The land exchange challenged in this litigation was part of a three-way land swap arranged by Princeton University. During the years 1980 to 1982, Princeton received a series of charitable donations of privately owned lands located within the confines of Grand Teton National Park in the State of Wyoming. Seeking to convert this gift of real property into cash, Princeton offered to sell the land to the National Park Service, which had acquired similar tracts in the past to protect Grand Teton Park against commercial development. The Park Service responded that lack of funds for new parkland purchases precluded it from accepting Princeton's otherwise very attractive offer. When subsequent negotiations between Princeton and other conservation-oriented prospective purchasers proved equally unsuccessful, the University devised an imaginative solution to the problem: a three-way land exchange in which Princeton would sell the bequest lands to a private energy development company, which would then exchange them for federal lands located outside the park that were suitable for commercial mining and energy development. Such an exchange would simultaneously provide Princeton with the cash it needed, prevent the commercial exploitation of the donated land, create additional parkland at no financial cost to the federal government, and provide tangible economic benefits to the private energy company.

In conjunction with three other eleemosynary institutions which were experiencing similar difficulties in disposing of land bequests,[2] Princeton reached an agreement with Rocky Mountain Energy Company ("Rocky Mountain") under which that company would purchase the Grand Teton properties owned by all four institutions and exchange them for federal coal lands in Wyoming's Corral Canyon that were contiguous to other tracts owned by Rocky Mountain. In December 1981, Rocky Mountain wrote to the Wyoming State Office of the Bureau of Land Management (BLM) of the Department of the Interior proposing the fee exchange of the private, Grand Teton lands for the Corral Canyon coal lands under section 206 of the FLPMA. The National Park Service and the BLM jointly prepared an Environmental Assessment which concluded that the proposed exchange was consistent with both the Park Service's land management objectives for Grand Teton National Park and the BLM's land use and resource management objectives for the Corral Canyon area. The BLM District Manager thereafter prepared a Land Report and Initial Recommendation in which he concluded that the public interest would be served by completing the exchange. In accordance with these decisions, the BLM continued to process the land exchange application.

Notice of the proposed exchange was published in the Federal Register[3] and public comments were invited in accordance

---

1. This section of the FLPMA is codified at 43 U.S.C. § 1716(a) (1983). The FLPMA as a whole is codified at 43 U.S.C. § 1701 *et seq.*

2. The other institutions were Dartmouth College, Vermont Law School, and the Memorial Sloan-Kettering Cancer Center.

3. 47 Fed.Reg. 40,912 (September 16, 1982).

with departmental regulations.[4] Numerous organizations and individuals submitted comments, the overwhelming majority of which strongly endorsed the proposed exchange. The supporters of the exchange included such diverse groups as Rocky Mountain and the institutional landowners (with their financial interests), environmental organizations (such as the Wyoming Wildlife Federation and the Wyoming Chapter of the Sierra Club), the Governor of Wyoming, the entire Wyoming congressional delegation, and various Wyoming State agencies.

The only comments opposing the proposed exchange were those filed by plaintiffs and by an affiliate of two other energy companies. The thrust of the opposing comments was that the proposed land exchange violated various federal statutes prohibiting affiliates of common carrier railroads, such as Rocky Mountain,[5] from leasing federal coal reserves for commercial development[6] and prohibiting railroads from transporting coal mined by their affiliates.[7] Plaintiffs contended that the proposed exchange, which would transfer to Rocky Mountain ownership federal coal lands that would otherwise remain available for leasing, was inconsistent with the spirit, if not the letter, of the statutory common-carrier coal leasing and transportation prohibitions, and that it therefore did not satisfy the "public interest" requirement of section 206 of the FLPMA. Finally, plaintiffs argued that the proposed exchange did not comply with the requirements of FLPMA section 206(b) that the land exchanged either be of equal value or that any discrepancy in valuation be made up with a cash payment.[8]

On January 5, 1983, the BLM District Manager rejected plaintiffs' protests. Plaintiffs timely appealed that decision. On June 2, 1983, the BLM State Director, acting with the concurrence of the Assistant Secretary of the Interior, again rejected plaintiffs' protests in a memorandum decision that responded point-by-point to plaintiffs' objections. This action followed.

### III

The parties appear to agree that, to the extent that judicial review of the Secretary's decision is available, the appropriate standard is that provided in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), which authorizes a reviewing court to "set aside agency action ... found to be (a) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Id.*

The defendants have mounted several threshold objections to judicial review in this case, however. The federal defendants contend that plaintiffs lack standing to challenge the Interior Secretary's decision. The private defendants (Rocky

---

**4.** See 43 C.F.R. § 2200.1(c) (1981).

**5.** Rocky Mountain is an affiliate of a common-carrier railroad, defendant Union Pacific Railroad. Both Rocky Mountain and the Union Pacific Railroad are wholly owned subsidiaries of defendant Union Pacific Corporation.

**6.** Plaintiffs cited section 2(c) of the Mineral Lands Leasing Act of 1920, codified at 30 U.S.C. § 202, which provides that "[n]o company or corporation operating a common carrier railroad shall be given or hold a [federal coal] permit or lease under the provisions of this chapter for any coal deposits except for its own use for railroad purposes."

**7.** Plaintiffs cited the Commodities Clause of the Interstate Commerce Act, 49 U.S.C. § 10746, which prohibits a common carrier under Interstate Commerce Commission jurisdiction from transporting in interstate commerce an article or commodity that is manufactured, mined or produced by the carrier or under its authority, or which it owns or in which it has an interest. *Id.*

**8.** The FLPMA provides that:

The values of the lands exchanged by the Secretary under this Act ... either shall be equal, or if they are not equal, the values shall be equalized by the payment of money to the grantor or to the Secretary concerned as the circumstances require so long as payment does not exceed 25 per centum of the total value of the lands or interests transferred out of Federal ownership. The Secretary concerned shall try to reduce the amount of the payment of money to as small an amount as possible.

43 U.S.C. § 1716(b).

Mountain, *et al.*) contend that Interior Department decisions concerning federal land management are committed to agency discretion and are therefore unreviewable. The Court finds neither of these objections persuasive, and it concludes that judicial review under the § 706(2)(A) standard is appropriate.

■ To establish their standing to sue, plaintiffs must establish (1) that they have suffered injury in fact, and (2) that they are within the zone of interests to be protected by the relevant legislation. *Association of Data Processing Service Orgs., Inc. v. Camp,* 397 U.S. 150, 151–52, 90 S.Ct. 827, 828–29, 25 L.Ed.2d 184 (1970). Here, plaintiffs have alleged that they have suffered significant, albeit limited, economic injury due to the Secretary's withdrawal of federal coal lands from the competitive leasing system, and that they will suffer even more severe economic injury if the Secretary is permitted to implement his alleged new policy of permitting railroads to gain access to federal coal lands. These allegations of present and future economic injury are sufficiently concrete to satisfy the injury in fact requirement.

As for plaintiffs' membership in the protected class, the language and legislative history of the Mineral Lands Leasing Act, and particularly of section 2(c), provide abundant evidence that Congress intended the prohibition on railroad access to federal

coal lease to protect independent coal companies such as plaintiff organizations' members from unfair competition.[9] Accordingly, the Court concludes that, taking the plaintiffs' allegations to be true,[10] they have established their standing to sue.

■ The contention of the private defendants that the Interior Department's "public interest" determination is committed by law to agency discretion, and therefore unreviewable, is equally unpersuasive. The Supreme Court has repeatedly held that executive agency determinations are presumptively subject to judicial review, except where a statute is drawn in such broad terms that there is no law to apply or where there is evidence of a clear legislative intent to preclude review by the courts.[11] Here the statutory language of FLPMA section 206 provides specific criteria to be applied in making public interest determinations,[12] and the statute also explicitly reflects the congressional intent that "judicial review of public land adjudication decisions be provided by law."[13] The Court plainly has the authority to review the Secretary's decision to determine whether it complied with these explicit statutory standards.

## IV

On the merits, plaintiffs have challenged the Secretary's decision on essentially three grounds.[14] First, they contend that

9. See, *e.g.,* Cong.Rec. 4739 (1919) (Sen. LaFollette); see generally, U.S. Department of Justice, *Competition in the Coal Industry,* (November 1980) at 83–85.

10. *United States v. SCRAP,* 412 U.S. 669, 689, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973).

11. See *Morris v. Gressette,* 432 U.S. 491, 501, 97 S.Ct. 2411, 2418, 53 L.Ed.2d 506 (1977); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 139–41, 87 S.Ct. 1507, 1510–12, 18 L.Ed.2d 681 (1967); See also, *Gott v. Walters,* 756 F.2d 902, 906 (D.C.Cir.1985).

12. The FLPMA provides that: "when considering the public interest the Secretary concerned shall give full consideration to better Federal land management and the needs of State and local people, including needs for lands for the

economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife and the Secretary concerned finds that the values and the objectives which Federal lands of interests to be conveyed may serve if retained in Federal ownership are not more than the value of the non-Federal lands of interests and the public objectives they could serve if acquired." 43 U.S.C. § 1716(a).

13. FLPMA § 102(a)(6), 43 U.S.C. § 1701(a)(6).

14. The three claims discussed below constitute the principal claims in the veritable fusillade of challenges that plaintiffs have launched against the Secretary's decision. The Court has considered the more minor salvos as well, and it has concluded that they, too, miss the marks at which they are aimed.

the FLPMA is merely an enabling statute that only governs land exchanges authorized under other statutes and that the Secretary lacked the authority under the FLPMA to approve the Corral Canyon exchange. Second, they contend, as they did before the agency, that provisions in the Mineral Lands Leasing Act (MLA), 30 U.S.C. § 202, and the Interstate Commerce Act, 49 U.S.C. § 10746, which respectively prohibit railroad affiliates from obtaining federal coal leases and prohibit common carriers from transporting commodities that they mine or produce, are implicitly incorporated in the FLPMA and that the Secretary's decision therefore violated the statute. Finally, they contend that even if the Secretary possessed authority under the FLPMA to approve the land exchange, his public interest evaluation constituted an abuse of discretion because it failed to consider adequately the potential anticompetitive effect of the exchange on western coal production.

### A.

■ The contention that an exchange of this sort is not authorized under the FLPMA is so lacking in support that it can only be characterized as frivolous. The statute provides in plain language that "A tract of public land or interests therein may be disposed of by exchange by the Secretary *under this Act* ..." FLPMA section 206, 43 U.S.C. § 1716(a) (emphasis added), and it refers in the next paragraph to "*the exchange authority granted by subsection (a) of this section,*" 43 U.S.C. § 1716(b) (emphasis added). Plaintiffs' interpretation of the FLPMA would ignore this explicit statutory language and render the emphasized words superfluous.

Such a reading would violate fundamental principles of statutory construction requiring fidelity to the plain meaning of statutory language [15] and favoring constructions that give meaning to every word of a statutory enactment.[16] Moreover, plaintiffs have identified no legislative history that contradicts this clear statutory language.[17] There is, therefore, simply no question that the FLPMA grants to the Secretary the authority to undertake land exchanges of the sort challenged here.[18]

---

**15.** See *United States v. Oregon,* 366 U.S. 643, 648, 81 S.Ct. 1278, 1280, 6 L.Ed.2d 575 (1961); *United Mine Workers Ass'n v. Federal Mine Safety and Health Review Comm.,* 671 F.2d 615, 621 (D.C.Cir.1982); *Aviation Consumer Action Project v. Washburn,* 535 F.2d 101, 106–07 (D.C. Cir.1976).

**16.** See *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979); *United States v. Menashe,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955).

**17.** The legislative history cited by plaintiffs either (1) relates to the FLPMA but is neither in point nor illuminating, or (2) relates to other statutes, *e.g.,* the 1978 amendments to the Mineral Leasing Act (P.L. No. 95–554). See Plaintiffs' Opposition at 22–33. While the Court recognizes that individual congressional enactments are to be construed harmoniously, and that an understanding of the complex regulatory scheme established by the legislature may facilitate such harmonious construction, it is equally obvious that the legislative history of different, subsequent legislation is weak authority for ignoring the plain language of the statute to be construed.

**18.** Plaintiffs assign great weight to a 1980 observation in a Department of Justice Report that the FLPMA "apparently does not provide substantive authorization for exchanges and indeed may conflict with federal coal leasing legislation." U.S. Dept. of Justice, *Report on Competition in the Coal Industry* (1980) at 93. However, this analysis, which the Department has apparently subsequently repudiated, is neither authoritative nor persuasive.

The analysis is not a contemporaneous statutory construction by the agency charged with administering the statute. Moreover, the quoted language itself suggests that the matter is hardly free from doubt, and the contemporaneous interpretation of the FLPMA by the Department of the Interior, the administering agency (see 43 U.S.C. § 1702(g)) should be obviously entitled to considerable deference.

Finally, and perhaps most significantly, the Report's conclusion rests upon a significant misreading of the relevant statutory language. The Report's analysis attaches great significance to the fact that the FLPMA authorizes exchanges "under applicable law," which the Report interprets as meaning that "FLPMA thus seems to provide a procedure for exchanges only if authorized by other statutes." *Report* at 92 note 249. However, the "applicable law" language quoted by the Report appears in a portion of the statute affecting National Forest System exchanges by the Secretary of Agriculture that is

## B.

■ Plaintiffs' contention that the MLA and Interstate Commerce Act provisions must be read into the FLPMA is likewise unsupported by statutory language. Nothing in the language of the FLPMA, which involves fee land exchanges only, incorporates, by reference or otherwise, the restrictions placed by these other statutes on the leasing, mining, or transportation of coal by common carriers. Conversely, nothing in the language of the MLA or the Interstate Commerce Act directs that the restrictions contained in these statutes shall also apply to fee land and coal exchanges under the FLPMA. Indeed, the MLA explicitly exempts FLPMA section 206 exchanges from the restrictions on disposition contained in the MLA. Section 37 of the MLA provides in relevant part that "The deposits of coal ... herein referred to, in lands valuable for such minerals, ... shall be subject to disposition only in the form and manner provided in this chapter, *except as provided in sections 1716* and 1719 *of Title 43* ..." 30 U.S.C. § 193 (emphasis added).

Plaintiffs attempt to explain away the absence of a textual linkage between the three statutes on the basis that the laws are linked by logic, and they further contend that failure to read the MLA and Interstate Commerce Act restrictions into the FLPMA effectively would create a vast

loophole which would permit the wholesale evasion of the MLA's restriction on coal leasing by railroad affiliates through the use of the FLPMA fee exchange provision. Noting that implied repealers of legislation are disfavored (see *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)), and that the FLPMA itself specifically states that "Nothing in this Act shall be deemed to repeal any existing law by implication," FLPMA § 701(f), 43 U.S.C. § 1701 note, plaintiffs assert that Congress could not have intended such an anomalous result, and that harmonious construction of the three statutes requires the reading of the MLA restrictions into the FLPMA.

The critical flaw in plaintiffs' argument is that it ignores the significant limitations placed on the Secretary's discretion by the express terms of the FLPMA. Section 206 of that statute requires the Secretary to conduct a detailed public interest analysis prior to approving each proposed fee exchange.[19] It does not give him *carte blanche* to approve wholesale transfers of federal or other coal lands to railroad affiliates. The Court is confident that the restrictions imposed by the public interest requirement are more than adequate to prevent the use of the FLPMA as a means of evading the coal-leasing prohibitions contained in the MLA.

most logically read disjunctively from the immediately preceding section (quoted in the text *supra* ), which grants the Secretary of the Interior authority to dispose of lands "under this Act."

Less truncated, the FLPMA statute provides that "A tract of public land or interests therein may be disposed of by exchange by the Secretary under this Act and a tract of land or interests therein within the National Forest System may be disposed of by exchange by the Secretary of Agriculture under applicable law where the Secretary concerned determines that the public interest will be well served ..." 43 U.S.C. § 1716(a). Both the parallel structure of the sentence, and the final reference to "the Secretary concerned" suggest that the statute grants two different sorts of authority to two different Secretaries. That being so, it is obviously a misreading of the statute to read the grant of authority to one Secretary, and restrictions on that authority, as applying to the grant of authority to the other Secretary. That, how-

ever, appears to be precisely what the Justice Department Report does: it reads the restriction on the Agriculture Secretary's land exchange authority to apply to exchanges made under the Interior Secretary's authority.

Given the generally different responsibilities of the two Secretaries, and the fact that primary responsibility for federal land management policy is vested in the Interior Secretary, see 43 U.S.C. § 1702(g), it is understandable that Congress would have granted broad authority to the Interior Secretary, while granting more restricted authority to the Agriculture Secretary. It appears to the Court that this is the more logical and correct reading of the statute, and that the alternative construction in the Justice Department Report distorts the statutory language and must therefore be rejected.

**19.** 43 U.S.C. § 1701(a); see *supra* note 13 and the discussion in section III–C, *infra.*

While, to be sure, some tension exists between these various congressional enactments, the Court is unprepared to conclude that harmonious construction of these statutes requires the substantial alteration by implication of the FLPMA's explicit statutory language. Accordingly, the Court holds that the MLA's ban on coal-leasing by common-carrier railroad affiliates is not incorporated in the FLPMA and does not extend to FLPMA fee exchanges.

### C.

Plaintiffs' final objection to the Corral Canyon land exchange is that, on the merits, the exchange is not in the public interest as required by the FLPMA. When viewed through a practical prism, nothing could be more in the public interest: Princeton and its sister institutions receive capital for their educational or health-providing ventures; parkland in the Grand Teton will remain unspoiled; and a private energy company receives land outside the national parks for commercial mining. However, plaintiffs assert that the Court should regard as paramount the potential anticompetitive effects of the proposed exchange, and that the Secretary failed properly to perform such an evaluation or to weigh its results in making his final public interest determination. Accordingly, they urge the Court to hold that the Secretary abused his discretion in approving the Corral Canyon exchange under the FLPMA.

The defendants have noted, correctly, that the FLPMA public interest provision does not include potential anticompetitive effects among the panoply of factors that the Secretary of the Interior must take into account in reading his public interest determination. The statute provides only:

> That when considering public interest the Secretary concerned shall give full consideration to better Federal land management and the needs of State and local people, including needs for lands for the economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife and the Secretary concerned finds that the values and the objectives which Federal lands or interests to be conveyed may serve if retained in Federal ownership are not more than the value of the non-Federal lands or interests and the public objectives they could serve if acquired.

43 U.S.C. § 1716(a). There is no mention at all of a requirement that the Secretary of Interior take into account in his public interest determination the antitrust implications of a proposed exchange. It can therefore be argued, as the Secretary did during the administrative proceedings below, that under the familiar principle of *expressio unius est exclusio alterius* Congress' failure to include potential anticompetitive effects among the enumerated categories of factors to be considered by the Secretary suggests that the FLPMA should be construed not to require such an analysis.[20]

The Court need not reach that issue, however, for whatever may be the proper resolution of this important question of statutory construction, it is appropriately left to another day. It is clear that here the Secretary did, in fact, proceed to consider the potential anticompetitive effect of the Corral Canyon exchange, and he properly found that it was not significant enough to preclude a determination that

**20.** Plaintiffs have cited numerous cases in which federal courts have held that agencies' public interest evaluations must include analyses of potential anticompetitive effects. See, e.g., *Sabin v. Butz,* 515 F.2d 1061 (10th Cir. 1975). These cases are distinguishable, however, because antitrust considerations were central to the agency's regulatory mission and, more importantly, because the statutory public interest requirement was otherwise undefined. In contrast, the FLPMA specifically defines the relevant factors to be considered by the Secretary in making a public interest determination, and it is also clear that these factors focus primarily on environmental and community development concerns, not antitrust concerns. Under such circumstances, it seems far more likely that the Interior Department is not required to assess the potential anticompetitive effects of land exchanges under the FLPMA. See *NAACP v. Federal Power Commission,* 425 U.S. 662, 669, 96 S.Ct. 1806, 1811, 48 L.Ed.2d 284 (1976) (phrase "public interest" takes meaning from the regulatory purposes of the legislation).

the exchange was in the public interest. Officials of the Bureau of Land Management's Wyoming office noted that the federal coal reserves disposed of through the Corral Canyon exchange "represent[ ] less than 3% of the federal coal disposed of through lease in Wyoming alone in [Fiscal Year] 1982." BLM Decision of June 2, 1983 (Rocky Mountain Ex. B–13) at 4.[21] They also noted that FLPMA exchanges were, and are,[22] considered case-by-case, on an ad hoc basis, and that the Corral Canyon exchange did not "represent a change in departmental policy for exchange rather than lease sale as the preferred method for disposing of federal coal nor does it set a precedent for such disposition." *Id.* As the BLM officials' response makes clear, the Corral Canyon exchange could have had only *de minimus* effects on competition within the coal industry, and any other potential effects were at best speculative.[23] Accordingly, the Court finds that, assuming the Secretary was required under the FLPMA to consider the potential anticompetitive effects of the Corral Canyon exchange, his evaluation was adequate and his decision was not an abuse of discretion under the statute.

### V

To sum up, the FLPMA grants the Secretary of the Interior broad authority to approve proposed federal land exchanges that are consistent with statutory requirements and which are in the public interest as defined by FLPMA section 206. The Secretary properly evaluated the proposed Corral Canyon exchange under these standards, and his determination that the exchange satisfied these statutory prerequisites is abundantly supported by substantial record evidence. Nothing in any of the statutes cited by plaintiffs precludes the Secretary from approving the Corral Canyon exchange. In short, it is clear that the Secretary's decision was neither arbitrary and capricious nor contrary to law, and that it therefore must be affirmed.

---

**21.** The Corral Canyon tract contains 22.3 million tons of federal coal, a paltry figure compared to the estimated 856.8 million tons of federal coal involved in 1982 federal coal leases in the state of Wyoming alone and the estimated 19.672 *billion* tons of federal coal for which leases were in effect as of 1982. *BLM Decision, supra,* at 4.

**22.** See 43 C.F.R. § 2200.0–6 (providing for individual, ad hoc, case by case review of proposed FLPMA § 206 land exchanges).

**23.** Even if the Secretary had found that the proposed exchange would have significant potential anticompetitive effects, he could properly have found that these were outweighed by the other relevant public interest factors listed above which strongly favored the proposed exchange. See *supra* p. 587.