NATIONAL COAL ASSOCIATION, Plaintiff,

v.

Donald P. HODEL, Secretary of the Interior, U.S. Department of the Interior, Burlington Northern, Incorporated, and Two wholly-owned subsidiaries of Burlington Northern, Incorporated: Meridian Minerals Company, and Burlington Northern Railroad Company, Defendants.

NORTHERN PLAINS RESOURCE COUNCIL; McCone Agricultural Protection Organization; and Montana Wildlife Federation, Plaintiffs,

v.

Donald P. HODEL, Secretary of the Interior; United States Department of the Interior; Burlington Northern, Incorporated; Meridian Mineral Company; and Burlington Northern Railroad Company, Defendants.

Nos. CV 85–115–BLG–JFB, CV 85–150–BLG–JFB.

United States District Court, D. Montana, Billings Division.

Oct. 27, 1987.

John W. Ross, Anderson, Brown, Gerbase, Cebull and Jones, P.C., Billings, Mont., Arnold Levy, Jerome H. Simonds and John S. Lopatto, III, Freedman, Levy, Kroll & Simonds, Washington, D.C., Thomas Slater, Jr., Hunton & Williams, Richmond, Va., Michael Barr and William Young, Hunton & Williams, Washington, D.C., Thomas Altmeyer, Mining & Reclamation Council, Washington, D.C., for plaintiff.

F. Henry Habicht, II, Asst. Atty. Gen., Land & Natural Resources Div. and Fred R. Disheroon, Sp. Litigation Counsel, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., Byron Dunbar, U.S. Atty., Dist. of Mont., Richard Aldrich, Regional Sol., Dept. of the Interior, Stephen H. Foster, Holland & Hart, Billings, Mont., for defendants.

Guy R. Martin, Perkins Law Firm, Washington, D.C., for Burlington Northern.

## MEMORANDUM OPINION

BATTIN, Chief Judge.

These actions challenge the authority, and proper exercise thereof, of the Secretary of the Interior to approve the exchange of coal-laden public lands for pri-

vate lands held by an affiliate of a common carrier railroad. The above-captioned partially consolidated cases are presently pending before the Court on cross-motions for summary judgment. For the reasons stated below, the defendants' motions are granted and the plaintiffs' motions are denied.

Plaintiff National Coal Association (NCA) is a trade association whose members include coal-producing companies.[1] NCA's membership includes companies mining coal in western states in competition with defendant Meridian Minerals Company (Meridian). NCA purports to represent its members' interests by dealing with public authorities in areas affecting the production, transportation, utilization, and sale of coal. Meridian is a member of NCA.[2]

Plaintiff Northern Plains Resource Council (NPRC) is an organization whose members include those residing, owning property, or having business interests in Circle, Montana, and the outlying McCone County area near the land subject to the exchange, hereinafter referred to as the "Circle West" exchange. NPRC is concerned with protecting the agricultural and environmental life style of the area from injury caused by strip mining and coal development. Plaintiff McCone Agricultural Protection Organization is an affiliate of NPRC. Plaintiff Montana Wildlife Federation is an organization of sportsmen and conservation groups using Bureau of Land Management (BLM) lands for recreational purposes. These foregoing plaintiffs shall be collectively referred to as the "NPRC" plaintiffs.

Defendant Donald P. Hodel is the Secretary of the Interior and is sued in his official capacity as fiduciary of the lands involved in the Circle West exchange. Defendant United States Department of the Interior (DOI), which includes the BLM, is the agency charged with administering federal coal leases and federal coal interest exchanges. These defendants shall be collectively referred to as the "Federal Defendants".

Defendant Burlington Northern Incorporated (BN Inc.) is a financial holding company that operates, through wholly owned subsidiaries, a common carrier railroad, defendant Burlington Northern Railroad Company (BN Railroad), and a mining company, defendant Meridian. BN Railroad maintains track within twenty (20) miles of the Circle West exchange. Meridian is the private participant in the land exchange issue. These defendants shall be collectively referred to as the "Private Defendants".

## FACTS AND CONTENTIONS

In November of 1981, Meridian submitted to the DOI a proposal to exchange its alternating checkerboard coal rights near Circle, Montana, with those of the Federal Government's located in the same area. The BLM commenced a study of the Circle West exchange proposal and, in December of 1982, released its environmental assessment requesting written comment from members of the public. In May of 1983, having considered the comments submitted and prepared its findings, BLM announced that the interests were suitable for exchange. Plaintiffs have at all times objected to the proposal.

On September 8, 1983, the DOI rejected all protests and approved the BLM decision finding the interests appropriate for exchange in accordance with § 206(a) of the Federal Land Policy and Management Act of 1976 (FLMPA), 43 U.S.C. § 1716(a). Section 206(a) permits fee-for-fee exchanges of federal lands for private when

---

**1.** At the commencement of this action, NCA was joined by a co-plaintiff, the Mining and Reclamation Council of America (MARC). During the pendency of the suit, MARC, also a trade association, merged with NCA, with NCA remaining as the surviving association.

**2.** As a consequence of the membership, Meridian has counter-claimed against NCA contending, by the filing of this suit, it acted in excess of its corporate powers and breached the fiduciary duty to deal in good faith with a member of the organization. In addition, Meridian has counterclaimed against NCA and MARC contending their joint actions in initiating litigation to deny coal exchanges violate federal antitrust law.

in the "public interest".[3] Thus, the United States transferred approximately 174.7 million tons of in place reserves (159.9 million tons recoverable coal) in or under about 7887 acres to Meridian in exchange for approximately 223.3 million tons of in place reserves (198.2 million tons recoverable coal) in or under about 11,553 acres. As a result of the exchange, Meridian consolidated its interests in the North Tract of the Circle West area while the Federal Government consolidated in the South Tract. Each unified tract contains slightly more than 400 million tons of coal underlying approximately 20,000 acres in the North Tract and 24,400 acres in the South Tract. The approval decision constituted final agency action of the DOI.

**3.** Section 206(a) of FLPMA, 43 U.S.C. § 1716(a), states:

> Exchanges of public lands or interests therein within the National Forest System
> (a) Authorization and limitations on authority of Secretary of Interior and Secretary of Agriculture
> A tract of public land or interest therein may be disposed of by exchange by the Secretary under this Act and a tract of land or interests therein within the National Forest System may be disposed of by exchange by the Secretary of Agriculture under applicable law where the Secretary concerned determines that the public interest will be well served by making that exchange: PROVIDED, that when considering public interest the Secretary concerned shall give full consideration to better federal land management and the needs of State and local people, including needs for lands for the economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife and the Secretary concerned finds that the values and the objectives which Federal lands or interests to be conveyed may serve if retained in Federal ownership are not more than the values of the non-Federal lands or interests and the public objectives they could serve if acquired.

**4.** Three cases were filed in 1983 in the United States District Court for the District of Columbia challenging federal-for-private land exchanges. Civil Action Nos. 83–3320 and 83–3330 were filed respectively by NCA/MARC and NPRC against Meridian *et al.* challenging the Circle West exchange at issue herein. On November 28, 1984, the Honorable Harold H. Greene, District Judge, in those actions granted Meridian's motions to dismiss for lack of personal jurisdiction. As a result, plaintiffs commenced the present action in the District of Montana where the defendants were amenable to personal jurisdiction. The third action before the D.C. Court, filed by NCA and MARC, challenged the "Corral

Plaintiff NCA, on behalf of its members, commenced this action on April 11, 1985, contesting the exchange.[4] In substance, NCA's motion for summary judgment first contends the exchange is not authorized by § 206(a) of FLPMA in light of §§ 2(c) and 37 of the Mineral Leasing Act of 1920 (MLA), 30 U.S.C. § 181 *et seq.*, and the Commodities Clause of the Interstate Commerce Act, 49 U.S.C. § 10746. Section 2(c) of the MLA, 30 U.S.C. § 202, generally prohibits issuance of a federal coal lease to a company operating a common carrier railroad.[5] The Commodities Clause generally prohibits a rail carrier from transporting goods manufactured or mined by it or under its authority.[6] Section 37 of the MLA,

Canyon" exchange, one similar to the Circle West exchange but involving the Wyoming land interests of the Federal Government and Rocky Mountain Coal Company, a subsidiary of the Union Pacific Railroad. The import of the D.C. Court's resolution of that action is discussed in detail in the following pages.

**5.** Section 2(c) of MLA, 30 U.S.C. § 202, states:

> Common carriers; limitations of lease or permit
> No company or corporation operating a common-carrier railroad shall be given or hold a permit or lease under the provisions of this chapter for any coal deposits except for its own use for railroad purposes; and such limitations of use shall be expressed in all permits and leases issued to such companies or corporations; and no such company or corporation shall receive or hold under permit or lease more than ten thousand two hundred and forty acres in the aggregate nor more than one permit or lease for each two hundred miles of its railroad line served or to be served from such coal deposits exclusive of spurs or switches and exclusive of branch lines built to connect the leased coal with the railroad, and also exclusive of parts of the railroad operated mainly by power produced otherwise than by steam.
> Nothing in this section and section 201 of this title shall preclude such a railroad of less than two hundred miles in length from securing one permit or lease thereunder but no railroad shall hold a permit or lease for lands in any State in which it does not operate main or branch lines.

**6.** The Commodities Clause, 49 U.S.C. § 10746, states: A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title [49 U.S.C. § 10501, et seq.] may not transport from a State or territory or possession of the United States to another State,

30 U.S.C. § 193, generally provides for the conveyance of federal coal to private parties through competitive leasing.[7] Second, NCA contends that, if authorized by § 206 of FLPMA, the approval was arbitrary, capricious, and an abuse of discretion because the Secretary in making the public interest determination did not adequately consider the competitive effects of conveying coal to an affiliate of a common carrier railroad.

Plaintiff NPRC, on behalf of its members, filed a complaint contesting the exchange on May 10, 1985. Based on a finding that the two cases involved common issues of law, the Court, on December 27, 1985, ordered that Claims 1 through 4 and the 11th claim (to the extent incorporating claims 1 through 4) in NPRC's complaint, CV 85–150–BLG–JFB, be consolidated with all claims for relief stated in CV 85–115–BLG–JFB. NPRC, in its motion for summary judgment, also contests FLPMA authorization of the exchange and the proper exercise of the Secretary's authority therein, if any. With respect to the latter contention, NPRC contends the Secretary in making the public interest determination failed to give consideration to the land use criteria of recreation, food, and fiber. Accordingly, NPRC, as well as NCA, request the Court to invalidate the Secretary's interpretation and implementation of the pertinent FLPMA and MLA sections and to void the Circle West coal interest exchange. NPRC has also moved for summary judgment on the remaining counts contained in CV 85–150–BLG–JFB.[8] These counts allege generally defendants' failure to implement statutory and regulatory prescriptions on land exchanges. Specifically, NPRC alleges the United States did not receive land of equal value, in violation of FLPMA § 206(b), that the exchange is not in conformity with the applicable land use plan, in violation of FLPMA § 202, that all unsuitability criteria were not applied, in violation of 43 C.F.R. 2200.1(d), and that no site specific environmental impact analysis was prepared, in violation of the National Environmental Policy Act, 42 U.S.C. § 4321.

In response, both the private and federal defendants filed cross-motions for summary judgment generally supporting FLPMA authorization of the exchange and a proper exercise of the Secretary's authority therein. In addition, both defendants maintain this action is barred, in whole or in part, by the doctrine of collateral estoppel on the basis of the decision in *National Coal Association v. Hodel,* 617 F.Supp. 584 (D.C. D.C.1985), *affirmed,* 825 F.2d 523 (D.C.Cir. 1987). After exhaustive briefing, the consolidated matters were brought before the Court on oral argument. The unconsolidated portions of NPRC's complaint have been submitted without oral argument. Today the Court decides the issues presented.

## DISCUSSION

Though rife with interests and arguments, the parties agree the case lends itself to two central issues. First, under the governing legislation, is the Secretary of the Interior charged with proper authority to approve the land exchange at issue? Second, if authority exists, did the Secre-

---

territory, or possession or a foreign country, an article or commodity that—
 (1) is manufactured, mined, or produced by the carrier or is under its authority; or
 (2) is owned by the carrier or in which it has an interest.
However, a rail carrier may transport such an article or commodity when it is necessary and intended for use in the business of that carrier. This section does not apply to timber and products manufactured from timber.

7. Section 37 of MLA, 30 U.S.C. § 193, states:
 Disposition of deposits of coal, and so forth
 The deposits of coal, phosphate, sodium, potassium, oil, oil shale, and gas, herein referred to, in lands valuable for such minerals, includ-

ing lands and deposits in Lander, Wyoming, coal entries numbered 18 to 49, inclusive, shall be subject to disposition only in the form and manner provided in this chapter, except as provided in sections 1716 and 1719 of Title 43, and except as to valid claims existent on February 25, 1920, and thereafter maintained in compliance with the laws under which initiated, which claims may be perfected under such law, including discovery.

8. In its motion, NPRC has abandoned Counts 8 and 10, and Count 11 alleges an Administrative Procedure Act violation for any error found in the remaining counts. Accordingly, the substantive allegations, Counts 5, 6, 7 and 9, are those considered by the Court.

tary properly act in this exchange? These issues provide the general framework for considering the merits of the case. However, before addressing the merits, the Court is presented with certain challenges that warrant initial examination.

## I. Authority of the Secretary of the Interior

### A. Claim and Issue Preclusion

■ Both the Federal and Private Defendants argue the present action is barred in whole or part by *National Coal Association v. Hodel,* 617 F.Supp. 584 (D.C.D.C. 1985), *affirmed* 825 F.2d 523 (D.C.Cir. 1987). In that case, the "Corral Canyon" case, NCA also sought to void the Secretary of the Interior's determination that a land exchange was permissible under the FLPMA. As indicated at note ˜4, the present action was filed coincidental to the D.C. action but dismissed and refiled here to satisfy jurisdictional requirements. As a result of the issues litigated in the Corral Canyon case, both defendants urge the Court to find the present case barred against NCA. Defendants do not attempt to bar the action with respect to NPRC.

■ The equitable doctrine of *res judicata* embraces two distinct but related concepts: claim preclusion and issue preclusion.[9] Both concepts are intended to relieve litigants of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication. *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). Though uniform in purpose and result, the concepts differ in operation. Under claim preclusion, a judgment on the merits in a prior suit bars a subsequent suit involving the same parties or their privies based on the same cause of action or relief sought and bars relitigation of all issues that were or could have been raised. *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326

n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979). Under issue preclusion, the subsequent suit is based on a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome. Mutuality of parties is not required for issue preclusion, however, so long as there is a common party to both suits. *Id.*

As is shown from the analysis *infra,* issue preclusion is available for both the Federal and Private Defendants. However, an examination of claim preclusion is useful.

Because of the breadth of claim preclusion, close attention must be accorded its application. Viewing the Corral Canyon and Circle West exchanges, it cannot be disputed that NCA and the Federal Defendants are common parties. Nor can it be disputed that a major thrust of each litigation concerns the Secretary's authority to approve the exchange of coal-laden interests. Finally, the Secretary's authority to act was resolved by the D.C. Court by final judgment. Thus, as in most instances, the application of claim preclusion rests on a determination whether the two suits involve the same cause of action.

■ Determination of what comprises a single cause of action is not a precise or mechanical test. *Ross v. International Brotherhood of Electrical Workers,* 634 F.2d 453, 458 (9th Cir.1980). *See also* 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4407 (1981). Among the factors to be considered are (1) whether the rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action, (2) whether substantially the same witnesses, documents, or other evidence is presented in the two actions, (3) whether the two suits involve infringement of the same right, and (4) whether the two suits arise out of the same transactional nucleus of material facts. *Derish v. San Mateo–Bur-*

---

**9.** The nomenclature accorded bar concepts often varies with opinion. Some courts and commentators use *"res judicata"* to mean both forms of preclusion while others speak of *res judicata* as "claim preclusion" and its counter-

part collateral estoppel as "issue preclusion." To avoid confusion, the Court opts for the more self-descriptive terms utilized in the text. *See* 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4402 (1981).

*lingame Board of Realtors,* 724 F.2d 1347, 1349 (9th Cir.1983). *See also United States v. Athlone Industries, Inc.,* 746 F.2d 977, 984 (3rd Cir.1984). Moreover, the tools of analysis are to be viewed pragmatically with the substance of the action controlling over the form. *Nevada v. United States,* 463 U.S. 110, 130 n. 12, 103 S.Ct. 2906, 2918–19 n. 12, 77 L.Ed.2d 509 (1983) *rehearings denied* 464 U.S. 875, 104 S.Ct. 210, 78 L.Ed.2d 185 *on remand* 720 F.2d 622 (9th Cir.1983). However, the transactional nucleus remains the key inquiry. *Derish, supra.*

Instructive wisdom can be gleaned from *Nevada v. United States, supra.* There the Supreme Court held a prior federal suit adjudicating water rights barred a subsequent federal suit between the same parties concerning the same rights. In finding the two cases presented the same cause of action, the Supreme Court relied on the reasoning of *Baltimore S.S. Co. v. Phillips,* 274 U.S. 316, 47 S.Ct. 600, 71 L.Ed. 1069 (1927):

> A cause of action does not consist of facts but of the unlawful violation of a right which the facts show. The number and variety of the facts alleged do not establish more than one cause of action so long as their result, whether they be considered severally or in combination, is the violation of but one right by a single legal wrong. The facts are merely the means, and not the end. They do not constitute the cause of action, but they show its existence by making the wrong appear. The thing, therefore, which in contemplation as its cause, becomes a ground for action, is not the group of facts alleged in the declaration, bill or indictment, but the result of those in a legal wrong, the existence of which, if true, they conclusively evince.

*Id.* at 130 n. 12, 103 S.Ct. at 2919 n. 12 (citations, emphasis, and quotations omitted).

The differentiating factor between the Corral Canyon and Circle West exchanges is the distinct land exchanges.[10] Examination of the substance of the exchanges is particularly interesting. The truly transactional nucleus of fact is any exchange that invokes the authority of the Secretary under the FLPMA. The exchange, regardless of situs, provides the basis for the right NCA seeks to enforce; namely, the right to be unhampered by unauthorized undertakings by the Secretary. Clearly, the rights established by the Corral Canyon decision would be significantly impaired by a contrary decision in the instant case. Moreover, the operative facts providing or dispelling the Secretary's authority—the governing statutes—are static and purely a legal predicate. There is no evidence of the exchange's peculiarities necessary for proof of whether the Secretary acted within his mandated scope. As noted at footnote 4, NCA desired to have the D.C. Court decide both exchanges. The peculiarities of the transfer are relevant to *how* the Secretary acts as opposed to *if* he may act. Thus, the suits arguably lend themselves to a claim preclusion framework.

Notwithstanding the foregoing, the Court will refrain from labeling the Corral Canyon and Circle West cases as the same causes of action. The cases do involve distinct land exchanges and therefore arise from a technically different transactional nucleus of fact. Accordingly, the Secretary's authority to act can be viewed as strictly an issue common to both cases, subject to issue preclusion analysis. Nevertheless, the claim preclusion analysis serves a very important function. It clearly shows the identity of the actions and the corresponding need for a strong preclusion resolution. Thus, viewing the issue under the analysis set forth below, the Court must conclude that NCA is barred from relitigating the authority of the Secretary to approve the exchange at hand.

*Parklane Hosiery, supra,* and its progeny have set forth various requirements of issue preclusion which may be summarized as follows:

> three-way transfer among the National Park Service, a subsidiary of the Union Pacific Railroad, and several eleemosynary institutions.

---

**10.** The Corral Canyon exchange involved lands located in or near Grand Teton National Park in the State of Wyoming and was effectuated by a

(1) a final judgment on the merits in the prior suit;

(2) common party against whom estoppel is asserted;

(3) issues presented in the subsequent suit were actually resolved in the prior suit;

(4) no significant change in the controlling facts or legal principles since the prior judgment; and

(5) no extenuating circumstances warranting an exception to the normal rules of preclusion.

*See also Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Allen v. McMurry, supra; United States v. Mendoza*, 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984); *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984).

■ Applying the aforestated requirements, the Court finds the application of issue preclusion warranted with respect to the Federal and Private Defendants. The Private Defendants, a nonparty to the previous suit, urge defensive use of issue preclusion. Defensive issue preclusion occurs when a plaintiff is barred from relitigating an issue the plaintiff has previously litigated unsuccessfully against the same or different party. *United States v. Mendoza, supra* at 159 n. 4, 104 S.Ct. at 571–72 n. 4. The use by a nonparty is warranted if the party against whom preclusion is sought had a full and fair opportunity to litigate the issues in the previous suit. *Golden v. Pacific Maritime Association*, 786 F.2d 1425, 1427–28 (9th Cir.1986). First, it is clear the D.C. District Court rendered a final judgment on the merits of the Corral Canyon case, and the subsequent appeal affirmed the District Court's opinion. Second, the prior and subsequent suits involve NCA, the party against whom estoppel is sought. Thus, the first two elements of the test are satisfied from even a cursory review of the D.C. District Court's decision.

The third element of the test requires a closer look at the D.C. District Court's decision. It cannot be disputed that the issue of the Secretary's authority to approve land exchanges under FLPMA, in light of other legislation, was thoroughly argued by the parties and resolved by the D.C. District Court. This is evidenced by the D.C. District Court's conclusion that "the FLPMA grants the Secretary of the Interior broad authority to approve federal land exchanges that are consistent with statutory requirements and which are in the public interest as defined by FLPMA Section 206". *National Coal*, 671 F.Supp. at 592. Additionally, the D.C. District Court specifically noted, at p. 590:

Nothing in the language of the FLPMA, which involves fee land exchanges only, incorporates by reference or otherwise, the restrictions placed by these other statutes [the Mineral Lands Leasing Act and Interstate Commerce Act] on the leasing, mining, or transportation of coal by common carriers. Conversely, nothing in the language of the MLA or the Interstate Commerce Act directs that the restrictions contained in these statutes shall also apply to fee land and coal exchanges under the FLPMA.

Thus, the authority of the Secretary was extensively examined and decided by the D.C. District Court.[11] Accordingly, the third element of the test is satisfied.

The fourth and fifth elements of the test are less mechanical in nature and require consideration of any factors arising beyond and apart from the previous decision and of any peculiar equities in the subsequent suit. The Court is not persuaded that such factors or equities exist that would negate application of issue preclusion. NCA has noted "dramatic" developments since the D.C. decision, namely, a second round of proposed exchanges and the publication by the Secretary of proposed rules relating to

**11.** The D.C. District Court framed the case with three central issues: (1) no authority under the FLPMA to approve land exchanges, (2) restrictive provisions of the MLA and Commodities Clause are incorporated into the FLPMA, and (3) improper public interest evaluation. The D.C. District Court noted that these three claims "constitute[d] the principal claims in the veritable fusillade of challenges that plaintiffs have launched against the Secretary's decision". 617 F.Supp. at 588, n. 14.

consideration of competition analysis. While it may or may not be true that such developments are "dramatic", it is certain that such developments are not new; these developments existed prior to Judge Greene's decision and cannot serve as a basis for relief from issue preclusion. Moreover, the factual differences between the Corral Canyon and Circle West exchanges, as alluded to earlier—eleemosynary institutions, the amount of coal, the type and location of land, and the respective railroad dominance—are not of sufficient force or relevance to alter otherwise indistinguishable legal issues.

In short, the Court is highly convinced that the issue of the Secretary's authority was fully and fairly litigated in the D.C. Court. The arguments raised by the respective parties there mirror the arguments raised in this Court. Further, the Court does not find it unduly unfair to preclude' NCA from relitigating the issues against the Federal and Private Defendants. Where one party has had an honest day in court and lost, a nonparty in a subsequent suit with an identity of legal issues is entitled to use the prior judgment as a shield. Accordingly, the application of issue preclusion in favor of the Private Defendants is warranted.

Having found there is neither a legal nor equitable basis for withholding the preclusive effect of the Corral Canyon decision, the Court must determine the reach of the preclusion. With respect to the both Defendants, the Court has determined the breadth of issue preclusion is wholly applicable to any question concerning the Secretary's authority to act under the FLPMA. The Corral Canyon decision effectively dealt with and disposed of NCA's arguments that provisions of the Mineral Lands Leasing Act and the Interstate Commerce Act limit the Secretary's authority under the FLPMA. Consequently, further arguments in this regard are barred. Given the extreme degree of identity, it is of no coincidence that the preclusive effect of the Corral Canyon decision effectively bars further attack on the Secretary's authority under the FLPMA by NCA against either the Federal or Private Defendants.

## B. Standing

NPRC has also challenged the Secretary's authority based largely on the arguments proffered by NCA. With respect to NPRC a standing issue has been raised. To establish its standing to sue, NPRC must demonstrate (1) that it has suffered an injury in fact and (2) that its interests are within the zone of interest protected by the statutes allegedly violated. *See* 5 U.S. C. § 702; *Association of Data Processing Service Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

■ The zone of interest protected by the Commodities Clause and § 2(c) of the MLA are limited. These provisions were enacted in response to concerns about common carrier monopolization over products in which they produced or otherwise maintained an interest. *See Delaware, L. & W.R. Co. v. United States*, 231 U.S. 363, 34 S.Ct. 65, 58 L.Ed. 269 (1913); *Northern Indian Pub. Service Co. v. Carbon County Coal Co.*, 799 F.2d 265 (7th Cir.1986). In this case, NPRC is neither a common carrier, specifically a railroad, nor in the coal business, the commodity at issue. It is comprised of landowners, residents, and recreational users arguably affected by the Secretary's decision. None of them compete with Meridian. While competitors of Meridian or someone in the coal business may have standing to complain of a Commodities Clause or MLA § 2(c) violation, NPRC is clearly not within the zone of interests protected by those provisions. *Cf. Block v. Community Nutrition Institute*, 467 U.S. 340, 348, 104 S.Ct. 2450, 2455, 81 L.Ed.2d 270 (1984) (while milk handlers have the right to seek judicial review of pricing orders issued by the Secretary of Agriculture, consumers have no such right).

■ At this point it is necessary to underscore the extent of NPRC's standing to sue. In the case of *National Wildlife Federation v. Burford*, 677 F.Supp. 1445 (D.Mont.1985), this Court found NPRC had standing under the MLA, 30 U.S.C.

§ 201, to challenge the Secretary's determination of fair market value relative to federal coal leases. Section 2(a, b) of the MLA specifically "require[s] the Secretary to engage in comprehensive land use planning and to consider the effects, including environmental and socioeconomic effects, which coal lease development might have on impacted communities or areas." *Id* at 15, *citing* 30 U.S.C. § 201(a)(1), (3)(A)(i), (3)(C). The Court found, among other things, the environmental concerns of NPRC directly tied to the harm sought to be protected under § 2(a, b) of the MLA and, as such, standing was demonstrated. *Id.* Similar environmental concerns are echoed in the public interest factors designated under § 206 of the FLPMA exchange provision, 43 U.S.C. § 1716(a). It is the FLPMA which provides the requisite NPRC standing in this case as opposed to the rail carrier provisions of the NLA and Commodities Clause. As noted ahead, lack of standing under § 2(c) does not necessarily prevent NPRC from invoking other provisions of the MLA.

## C. FLPMA Authorization

■ Having dispensed with NCA's and NPRC's ability to challenge the Secretary's authority as a preliminary matter, there does remain one issue raised by NPRC ripe for resolution. Among the consolidated counts, NPRC contends the disposition of the coal laden lands involved in the exchange is not appropriate under the FLPMA. In support, NPRC relies on § 37 of the MLA, 30 U.S.C. § 193, which requires disposition of coal deposits under the MLA's provisions.[12] Prior to the enactment of the FLPMA in 1976, § 37 of the MLA allowed disposition of valuable miner-

als through leasing. Section 206 of the FLPMA authorizes disposition of valueable minerals through exchange. In 1978, the MLA was amended (by the Federal Coal Leasing Amendments) to plainly except FLPMA §§ 206 and 209 (43 U.S.C. §§ 1716, 1719 respectively) from its purview.

Where, as here, resolution of a conflict turns on statutory construction, the Court looks first to the language employed and then to the legislative history if the language is unclear; otherwise, plain language will prevail. *See Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Heppner v. Aleyeska Pipeline Service Co.,* 665 F.2d 868 (9th Cir.1981). Moreover, reliance on legislative history to devine the intent of Congress is a step to be taken cautiously. *See Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977) *rehearings denied* 430 U.S. 976, 97 S.Ct. 1668, 52 L.Ed.2d 371. The Court cannot ignore the clear import of the MLA amendment. As succinctly stated by the D.C. Circuit Court, "[i]f that language did not do the job [excepting FLPMA §§ 206 and 209], none could." 825 F.2d at 528. Even resort to the legislative history is unavailing.[13] Both the Senate and House reports make clear the exchange authority of the Secretary under FLPMA in light of the MLA amendment. *See S.Rep. No. 1169,* 95th Cong., 2d Sess., p. 8; *H.R.Rep. No. 1635,* 95th Cong., 2d Sess. p. 6, U.S.Code Cong. & Admin. News 1978, pp. 4736, 4739.

Nevertheless, NPRC seeks to erode the vitality of FLPMA § 206 by relying on the remarks of Representative Kazan that "the purpose of the provision is to permit the Secretary to resolve land title problems created by such mineral reservations in situations where no substantial mineral value

12. Though a standing question might again appear relevant, the Court thinks not. The action of the Secretary in this case was under the authority ostensibly conferred by FLPMA § 206, and it is this provision which provides NPRC's standing. Other statutory provisions under which standing exists may be invoked. The invocation of MLA § 37 arguably invokes the MLA in general, in parts of which NPRC may have standing. Accordingly, a standing question with respect to MLA § 37, in light of the FLPMA thrust, is not involved. *Cf. Naartex*

*Consulting Corp. v. Watt,* 722 F.2d 779, 790 (D.C.Cir.), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984) (no private cause of action under the MLA).

13. Judge Greene noted, and the Court thinks rightly so, that the legislative history of NLA § 37 amendment "is weak authority for ignoring the plain language" of FLPMA § 206. 617 F.Supp. at 589, n. 17.

is involved." 124 Cong. Rec. 333, 282 (October 3, 1978). Reliance on this single statement is misplaced. First, the committee reports form the more authoritative indicator of legislative intent. *Northeast Bancorp, Inc. v. Board of Governors,* 472 U.S. 159, 170, 105 S.Ct. 2545, 2551–52, 86 L.Ed.2d 112 (1985). While the view of an individual legislator may be persuasive, it is not controlling unless the language was added on the floor and is the sole legislative history. *Id.; see also Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). In contrast, the MLA § 37 amendment was not added on the floor, and Rep. Kazan's statement is not the sole legislative history. Second, MLA § 37 concerns "valuable" minerals and it follows that the amendment excepting FLPMA pertains to valuable mineral exchanges. Otherwise, the amendment would not be necessary to permit only exchanges of non-valuable minerals. Third, and perhaps most telling, is that Rep. Kazan's statement is most aptly directed at FLPMA § 209 which permits the Secretary to convey a mineral estate to the surface owner when "there are no known mineral values in the land" or when "non-mineral development of the land ... is a more beneficial use". 43 U.S.C. § 1719(b).

In short, the legislative history in general supports the plain language of THE MLA amendment. As summed up by the D.C. Circuit Court, "[t]he Kazan remark is no smoking gun, nor even a water pistol." 825 F.2d at 528. Accordingly, NPRC's argument is not well founded.

## II. *Exercise of Authority*

■ The authorization of the Secretary having been resolved as to all parties, the Court may proceed to review the exercise of such authority. However, before the Court can scrutinize the Secretary's action, it must first be satisfied, not unlike the question of standing, that the action is appropriate for judicial review. A reading of the FLPMA reveals no provision for judicial review; plaintiffs must therefore seek review·under the general provisions of the Administrative Procedure Act (APA).

There is authority for the proposition that public interest determinations are by law committed to agency discretion and thus unreviewable. *See Lewis v. Hickel,* 427 F.2d 673 (9th Cir.1970), *cert. denied* 400 U.S. 992, 91 S.Ct. 456, 27 L.Ed.2d 440 (1971); *National Forest Preservation Group v. Butz,* 485 F.2d 408 (9th Cir.1973); *Sierra Club v. Hickel,* 467 F.2d 1048 (6th Cir.), *cert. denied* 411 U.S. 920, 93 S.Ct. 1545, 36 L.Ed.2d 313 (1973). However, the APA exception from judicial review, 5 U.S.C. § 701(a)(2) applies only where "in a given case there is no law to apply". *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). The Court is inclined to find that the enumerated factors of § 206 of FLPMA do provide a meaningful standard upon which judicial review may rest. Accordingly, the Court finds the Secretary's actions subject to review under the APA and must now determine whether such action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). This standard is highly deferential and presumes the validity of agency action. *Citizens to Preserve Overton Park, Inc., supra,* at 415, 91 S.Ct. at 823.

## A. Competitive Effects

■ Assuming proper authority under the FLPMA, NCA contends that the Secretary's approval of the Circle West exchange was an abuse of discretion for failure to consider the potential anticompetitive effects of the exchange in his public interest determination. The Corral Canyon case again is highly instructive on this point. Referencing § 206 of the FLPMA, the D.C. District Court stated:

[T]he FLPMA public interest provision does not include potential anticompetitive effects among the panoply of factors that the Secretary must take into account in reading his public interest determination. [statute omitted] There is no mention at all of a requirement that the Secretary of Interior take into account in his public interest determination the antitrust implications of a proposed ex-

change. It can therefore be argued, as the Secretary did during the administrative proceedings below, that under the familiar principle of *expressio unius est exclusio alternus* Congress' failure to include potential anticompetitive effects among the enumerated categories of factors to be considered by the Secretary suggests that the FLPMA should be construed not to require such an analysis. 617 F.Supp. at 591. The D.C. District Court added, at footnote 20:

> Plaintiffs have cited numerous cases in which federal courts have held that agencies' public interest evaluations must include analyses of potential anticompetitive effects. *See, e.g., Sabin v. Butz,* 515 F.2d 1061 (10th Cir.1975). These cases are distinguishable, however, because antitrust considerations were central to the agency's regulatory mission and, more importantly, because the statutory public interest requirement was otherwise undefined. In contrast, the FLPMA specifically defines the relevant factors to be considered by the Secretary in making a public interest determination, and it is also clear that these factors focus primarily on environmental and community development concerns, not antitrust concerns. Under such circumstances, it seems far more likely that the Interior Department is not required to assess the potential anticompetitive effects of land exchanges under the FLPMA. *See NAACP v. Federal Power Commission,* 425 U.S. 662, 669, 96 S.Ct. 1806, 1811, 48 L.Ed.2d 284 (1976) (phrase "public interest" takes meaning from the regulatory purposes of the legislation).

*Id.* Though reaching this conclusion, the D.C. District Court opted to find that the Secretary had adequately assessed any anticompetitive effects, whether required or not.[14] This result was affirmed by the D.C. Circuit Court, 825 F.2d at 532.

This Court, however, finds the D.C. District Court's analysis wholly persuasive. In determining what is in the public interest, the Secretary *must* consider the factors specifically enumerated in § 206. These are the factors central to the agency's regulatory mission—to better federal land management and the needs of State and local people. The Secretary has discretion, of course, to consider any other factor deemed relevant. However, his mandated obligation ceases when the specifically enumerated factors have been considered. Moreover, the Interior Department in addressing the issue of the administrative level stated:

> The effects on competition are not required to be addressed during the Department's fee exchange decision-making process. These are matters that are outside the boundaries of the Department's mission and of its statutory mandate.

*See* Joint Appendix No. 55 (Decision Document on Protests). It is an elemental tenet of administrative review that the interpretation of the agency charged with administrating a statute is entitled to considerable deference. To sustain the interpretation, a court need not find that it is the only permissible construction which the agency might have adopted but only that the agency's understanding of the statute is sufficiently rational to preclude a court from substituting its judgment for that of the agency. *Chemical Manufacturers Association v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985); *Chevron USA Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). The Court concludes that the Interior Department's interpretation is rationally based and that the potential anticompetitive effects of an exchange is not a required consideration.[15]

14. Because the necessity of considering anticompetitive effects was "left to another day", the issue is not subject to issue preclusion. 617 F.Supp. at 591.

15. The Department of Interior has announced that it will consider potential anticompetitive effects of future land exchanges. *See* 51 Fed. Reg. 12069 (1986); 43 C.F.R. subpart 2203. This announcement cannot be applied retroactively nor should it be viewed as a confession of error. It merely imposes upon the Secretary an obligation normally undertaken in other circumstances by other agencies.

Simply put, the Department of the Interior, at the time of this exchange, was not charged with consideration of antitrust implications, namely, potential anticompetitive effects. This consideration is appropriately handled by other agencies, the Interstate Commerce Commission for example, which remain open for recourse if, at some future date, Meridian seeks to exploit a wrongful competitive advantage.

### B. Food, Fiber, and Recreation

 NPRC has contended that the Secretary failed to give consideration to the three FLPMA § 206 factors designated above in approving the Circle West exchange. As an organization dedicated to environmental concerns, these particular factors are of obvious importance.

The Court's analysis therein must begin with inspection of the BLM Decision Document/Lands Report (J.App. No. 43) which recommends that the federal government consolidate its interests in the South Tract of the Circle West lands. At page 8 of the Decision Document, FLPMA § 206 public interest factors are expressly brought to attention. As can be seen at pages 8–14, public interest factors are not specifically designated as such but are subsumed under the broader categories of: (1) Better Land Management, (2) State and Local Considerations, (3) Economic Considerations, (4) Environmental Considerations, and (5) National Concerns. At this point, the Court must be mindful that the methodology employed by the Secretary, and the assumptions drawn therein, must be sustained if reasonable. *See State of California v. Watt*, 712 F.2d 584, 600 (D.C.Cir. 1983). Under the Environmental Considerations category, the BLM advised:

> Neither the Meridian exchange EA [Environmental Assessment] nor public comment identified additional impacts of consummating the exchange beyond those designated in the Fort Union Region EIS [Environmental Impact Statement] or the Fort Union circle West III site specific

analysis. These impacts from coal development would occur to some varying degree whether the exchange takes place or Circle West III is leased. The only new consequence is the additional acres distributed should both exchange tracts be fully developed.[16]

Thus, it is appropriate to consider the aforementioned documents as well.

Recreational concerns are addressed in the Fort Union Draft EIS (J.App. No. 31) at page 135, noting a doubling of demand, and at pages 95–96 noting potential inadequate recreational facilities in McCone County through the 1990's. The site specific analysis (J.App. No. 16) at page 48 addresses recrational concerns, noting concern for existing facilities. On this basis alone the Court is bound to conclude that the recreational impacts of coal development (leasing or exchange) were properly before the Secretary for consideration along with the other public interest factors.

With respect to food and fiber, the BLM Decision Document, albeit tersely, expressly referred to soils impact under the Environmental Considerations category (p. 14). The Meridian Coal Exchange Environmental Assessment (J.App. No. 36) is more illuminating wherein, at pages 9–10, 16–17, and 19–20, specific attention is given to soils, agriculture, vegetation, agricultural production, and agricultural economics. The Draft EIS provides agricultural information generally at pages 87–90 and specifically at pages 121–122. The site specific analysis relates further concerns at page 48. Again, the food and fiber factors, as incorporated in the agricultural concerns, were properly before the Secretary for consideration.

NPRC has not shown to the Court's satisfaction how consideration of the above-referenced information was arbitrary and capricious. NPRC does not dispute the accuracy of the information. The Meridian Coal Exchange Decision Document/Land Report, at page 19, specifically noted NPRC's public interest concerns and found

16. The Fort Union Region EIS considered, in part, the suitability of the McCone County fields for leasing. The Circle West I is included within the North Tract of the exchange, Circle West II is within the South Tract, and Circle West III combines Circle West I and II.

it to have been "adequately addressed in the Decision Document/Lands Report, the Meridian EA, the Fort Union Coal Region EIS and supporting documentation, and specific written responses." In the same document thereafter, the pro's and con's of the various concerns, per alternative, were set forth, implicitly incorporating the issues raised. At best, the Court can criticize only the form of the Secretary's analysis. The form, however, provides no basis for disrupting the Secretary's "power to weigh the competing interests and arrive at a balance", *Bowman Transportation, Inc. v. Arkansas–Best Freight System*, 419 U.S. 281, 293, 95 S.Ct. 438, 445, 42 L.Ed.2d 447 (1974), and, the substance showing, the Court "will not pass upon the wisdom of the agency's perception of where the public interest lies". *Telocator Network of America v. FCC*, 691 F.2d 525, 538 (D.C. Cir.1982). Accordingly, the Court finds the exercise of authority properly within the standard contemplated by the APA.

### C. Remaining Issues

For clarity's sake, the claims discussed to this point are those consolidated in CV 85–115–BLG–JFB and CV 85–150–BLG–JFB. The foregoing discussion involves those claims of NPRC remaining in CV 85–150–BLG–JFB on which the respective parties have cross-motioned for summary judgment.

### 1. Equal Value

Pursuant to FLPMA § 206(b), 43 U.S.C. § 1716(b), when the Secretary of the Interior exercises his exchange authority, the "values of the lands exchanged ... either shall be equal, or if they are not equal, the values shall be equalized by the payment of money to the grantor or to the Secretary concerned as the circumstances require ...". NPRC contends the South Tract received by the United States was of lesser value due to higher stripping ratios, multiple coal seams, and burdensome wildlife stipulations. In addition, NPRC con-

tends the basis for the 1% overriding royalty retained by the United States was not rationally explained.

As a point of reference, the exchange resulted in the acquisition by the United States of approximately 223.3 million tons of reserves underlying 11,553 acres. In return, Meridian acquired approximately 174.7 million tons of reserves underlying 7,887 acres. *See* Minerals Appraisal Report (J.App. No. 53). Using a selected price of $9.70/ton the Economic Evaluation Branch of the BLM concluded (1) the fair market value of the lands acquired by the United States equaled $52.538 million ($58.031 million including the 1% royalty) and (2) the fair market value of the lands acquired by Meridian equaled $44.753 million. As a consequence, Meridian was owed $7.785 million (excluding the 1% royalty) to $13.278 million (including the 1% royalty) to equalize monetary values. Rather than requesting the equalizing money under FLPMA § 206(b), Meridian donated this sum to the Interior Department.

The Linowes Commission Report (Fair Market Value Policy for Federal Coal Leasing, J.App. No. 62) considered the mining costs between the two Tracts. There, upon review of the appraisal report, the Commission reported that as a result of the Government receiving nearly 50 million tons extra the "additional tonnage offset the higher mining costs of the South Tract in the DCF analysis." [17] J.App. No. 62 at 465. Ultimately, the Commission refrained from drawing a firm conclusion as to the value determination but did indicate, with some criticism, that regardless of the tract selected, the Government was likely to receive more value than relinquished. J.App. No. 62 at 462.

While the Commission Report is illuminating, the focus must be the appraisal report itself. Clearly, the analysis recognized the highest and best use of the land is for coal extraction and development with reclamation to follow, a use not disputed

---

**17.** Discounted Cash Flow (DCF) methodology consists of cash flow simulation of the life cycle of mining operations and is one of three recognized valuation methods embodied in the Uniform Appraisal Standards for Federal Land Acquisitions, as incorporated in the FLPMA pursuant to 43 C.F.R. § 2201.3(b).

here. Specifically, the analysis determined what the respective parties would obtain in terms of coal value. Furthermore, the costs developed in the analysis "were developed on mine simulations of a dragline and truck/shovel operations". J.App. No. 53 at 10. Additional support is found in the equal value report contained within the Decision Document/Land Reports (J.App. No. 43). Therein, determination of equal value was characterized as "dealing with the quantities, qualities and overburden ratios associated with the coal resource", and the DCF comparison "takes into account time of the mining processes, environmental controls, and other engineering and marketing factors." J.App. No. 43 at 15. Thus, it appears the higher mining costs associated with the South Tract were factored into the analysis. Clearly the DCF comparison set forth a reasonable basis for the Secretary's determination of fair market value.

With respect to wildlife stipulations imposed on the South Tract, resort must again be directed to the appraisal method. The Uniform Appraisal Standards preclude consideration of "changes in value occurring after" federal land acquisition. *See* Private Defendants Ex. 2 at 6–7. Thus, as a preliminary matter, the inclusion of wildlife stipulations on the South Tract *after* federal acquisition cannot serve as equal value consideration. Simply put, the wildlife constraints were not applicable to the lands while privately held by Meridian.

Last among NPRC's attacks upon fair market value determination is the purpose of the 1% freestanding royalty imposed on Meridian's acquisition of the North Tract. The attack may be disposed of readily. The Decision Document on Protests (J.App. No. 55), noting the competitive edge of the North Tract due to lesser mining costs, explained the 1% royalty (along with a four-year moratorium on mining operations) was imposed to make the two Tracts "equally attractive for sale or lease in the marketplace". J.App. No. 55 at 3. This reasoning was previously set forth in the Decision Document/Land Report (J.App. No. 43 at 17). Thus, there is no ground for attacking the Secretary's action in this re-

gard as the purpose was clearly and rationally explained.

In sum, the factual findings and policy judgments of the Secretary in determining fair market value shall be accorded the great deference they are due. With all arguments raised in this respect, the Court must conclude that NPRC has failed to meet its heavy burden required under the APA.

## 2. Unsuitability Criteria

■■ As part of the exchange analysis, the unsuitability criteria of 43 C.F.R. Subpart 3461 is to be applied. 43 C.F.R. § 2201.1(d). NPRC contends the wildlife criterion (# 15) was applied based on incomplete antelope information relative to the North Tract. Initially, it appears NPRC failed to perfect this challenge by raising this specific issue—antelope concern—at the agency level. *See generally,* J.App. Nos. 22, 29, 39, 44, 49, 52 (NPRC objections and coments). Due to this critical failure, NPRC cannot be heard to complain now. *Intertribal Council of Nevada v. Department of Labor,* 701 F.2d 770, 771 (9th Cir.1983); *Getty Oil Co. v. Andrus,* 607 F.2d 253, 256 (9th Cir.1979). In any event, the Secretary did consider all unsuitability criteria (J.App. No. 43 at 7, J.App. No. 12 at 13–22), including the garnering of information relative to the wildlife criterion (J.App. No. 33 at 1). The balancing of these interests is appropriately left to the Secretary.

## 3. Land Use Planning Requirements.

■■ FLPMA regulations specifies that public lands are to be administered in accordance with land use plans prepared by the BLM. *See* 43 C.F.R. §§ 2201.1(a), 2200.2(b). At issue is the exchange's compliance with the applicable plan, the Redwater Management Framework Plan (MFP) (J.App. No. 12). NPRC contends Interior must amend the Readwater MFP to specifically discuss the exchange.

The planning regulations require an examination of the applicable MFP to assure that an exchange is in conformance with

planning decisions. As stated by the BLM, in interpreting its regulations:

> The FLPMA exchange rules require simply that disposals be in conformance with planning determinations [43 C.F.R. 2200.1 and 2200.2(b) ]. The planning determination here was acceptable for further consideration for development, and either exchange or lease is in conformance with that determination. The current land use planning rules call for conformance of actions within MFP decisions, 43 C.F.R. 1601.8(b)(3)(i), and call for plan amendments only where the proposal is not in conformance with the MFP decisions [43 C.F.R. 1601.8(b)(3)(i) ]. Thus, no planning amendment is required under the 43 C.F.R. 1601 regulation or FLPMA prior to consummation of the coal exchange. If the exchange were completed, then further planning for new federal coal holdings thus acquired would necessitate that an amendment to the Redwater MFP be completed before those new coal holdings could be leased. This is required by 43 C.F.R. 1601.8.

Decision Document/Lands Report, J.App. No. 43.[18] The Redwater MFP decisions identify federal coal in the Circle West area as being "acceptable for further consideration for coal leasing". J.App. No. 12 at 13, 77, 140. At the heart of the Circle West exchange is the facilitation of coal development, the United States possessing a unified area so as to promote coal leasing. As stated in the Decision Document/Lands Report:

> "Development" clearly indicates coal leasing and provision for site development. The coal exchange proposed is an alternate method to achieve both the lands and mineral objectives and decisions reached in the [Redwater] plan.

J.App. No. 43 at 7. In short, the Court cannot say that the Circle West exchange is inconsistent or not otherwise in conformance with the REdwater MFP. The Interior's reasonable interpretation that its own regulations have been satisfied is conclu-

sive. *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

4. NEPA Requirements.

█ Pursuant to § 102 of the National Environmental Policy Act (NEPA), preparation of an Environmental Impact Statement [EIS] is required for all "major federal actions significantly affecting the quality of the human environment ...". 42 U.S.C. § 4332(2)(C). It is undisputed that the Secretary did not prepare an independent EIS for the Circle West exchange. Rather, the Secretary maintains NEPA compliance through the Fort Union Draft and Final EIS and the Circle West Environmental Assessment (EA) and related documents. Accordingly, this Court must determine if the Secretary's action in not preparing a new EIS is reasonable. *Foundation for North American Wild Sheep v. United States Department of Agriculture,* 681 F.2d 1172, 1177 (9th Cir.1982).

NPRC and the Private and Federal Defendants direct the Court's attention to *Southern Oregon Citizens Against Toxic Sprays, Inc. v. Clark,* 720 F.2d 1475 (9th Cir.1983), a case involving the use of prior EIS and supplemental EA with respect to NEPA compliance. The view of the Circuit is most insightful:

> An EA need not conform to all the requirements of an EIS. The EA must support the reasonableness of the agency's decision not to prepare a new or supplemental EIS. Together, the EA and the programmatic EIS must provide the information necessary reasonably to enable the decisionmaker to consider the environmental factors and to make a reasonable decision. The label of the document is unimportant. We review the sufficiency of the environmental analysis as a whole.

*Id.* at 1480 (quotations and citations omitted). In *Southern Oregon Citizens,* the Circuit concluded the EA and EIS were inadequate but recognized that appropriate analysis can be included through an EA in order to "[allow] the BLM to consider the

---

**18.** Subsequent to issuance of J.App. No. 43, rulemaking altered the citations to the planning rules. The current rules also do not require an amendment where the exchange conforms to planning decisions. *See* 43 C.F.R. §§ 1610.5–3(a), 1610.8(a)(3).

scientific uncertainty in the least cumbersome manner, without having to prepare a new or supplemental EIS." *Id.* at 1480–81. As such, it is appropriate for the Court to consider the various documents supporting Circle West environmental analysis to determine whether the Secretary acted reasonably in not preparing a new EIS.

With respect to the environmental documents at issue, the NPRC contends they ignore critical site-specific concerns including coal end use, impacts of coal conversion facilities, and omissions of noncriteria pollutants. The starting point of review is the Meridian EA itself as this document may be sufficient to establish the reasonableness of the Secretary's decision. *Foundation for North American Wild Sheep*, 681 F.2d at 1179, n. 29. As previously discussed by the Court, the EA contains analysis of a plethora of environmental consequences including impacts to geology, hydrology, climate and air quality, soils and reclamation potential, land uses, wildlife, cultural resources, and socioeconomics. J.App. No. 36 at 15–21. The impacts were considered with respect to both the North and South Tracts. With regard to the aforementioned consequences, the EA appears to be in conformance with the guidelines announced under § 102 of NEPA, 42 U.S.C. § 4332(2)(C). Further, as stated in the introduction to the EA:

> The purpose of this Environmental Assessment (EA) is to assess impacts on the human and physical environments based on the proposed exchange. The EA addresses both a north and south tract individually to provide a comparison of which tract would be the best selection for federal ownership. It specifically assesses the possible exchange of coal and potential mine disturbance. It does not assess the possible end-use of the coal product nor the impacts associated with a possible plant, as these have been addressed in the Fort Union Coal Region EIS (draft) and associated documents.

J.App. No. 36 at 1. Thus, if such analysis is in the EIS and supporting documents, or otherwise remedied, the decision of the Secretary not to prepare a new EIS will be reasonable.

The Fort Union draft EIS contains lengthy information relative to the development and possible end uses of Circle West coal including detailed discussions of the exchanges' impacts on water and air resources, agriculture and land disturbance, wildlife, cultural features, community infra-structure and public services, aesthetics, recreation, and socioeconomic conditions. J.App. No. 31 at 8–9, 36–37, 42–47, 60–62, 64–70, 72, 104, 107, 121–122, 127–128, 131–135, 138–139, 142–143, 148–149, 151–152. Furthermore, the Interior prepared an Air Quality Information Supplemental to the draft EIS which analyzed the air pollution effects associated with a power plant on the Circle West Tracts. *See* Private Defendants Ex. No. 5. In addition, the Tract Summaries previously prepared by the Interior (J.App. No. 16), which analyze in part the environmental concerns raised by NPRC, were incorporated by reference into the draft EIS. J.App. No. 31 at 2. To be sure, the Tract Summaries, in particular Circle West III, does not include all acreage affected by the exchange. However, NPRC has failed to demonstrate how the impacts on the exchange acreage would differ materially from the tract summary acreage. As should be noted, the draft EIS does include all exchange acreage. Based on the data contained in the documents above, as well as the EA, the Court cannot conclude the Secretary's decision not to prepare a new EIS was unreasonable.

A final point regarding site-specific analysis warrants discussion. In the introduction to the draft EIS, it is recognized that the coal conversion facility analysis "is done at a general level and is not meant to supercede the various permitting processes in ... Montana ...". J.App. No. 31 at 2; *see also* J.App. No. 43 at 6. With respect to Meridian's lands after the exchange, Montana law will require environmental analysis before development can proceed. *See* Mont. Code Ann. §§ 75–1–201, *et seq.*, 75–20–101 *et seq.*, 82–4–101 *et seq.*, 82–4–201 *et seq.* With respect to the federal lands, further environmental analysis will again be required before coal mining can

proceed. *See* 30 C.F.R. §§ 741.13, 745.-13(b). It is supportable that Interior can defer a detailed final site specific analysis to subsequently prepared EIS's and comply with NEPA. *See Enos v. Marsh,* 769 F.2d 1363 (9th Cir.1985); *National Wildlife Federation v. Coston,* 773 F.2d 1513 (9th Cir.1985). For the reasons stated, the Court finds no NEPA violation.

An appropriate order shall issue in accordance with this Memorandum Opinion.

### ORDER

Pursuant to the Memorandum Opinion filed this day in the above-captioned case,

IT IS ORDERED that:

1. Summary judgment is granted in favor of defendants and against plaintiff in CV 85–115–BLG–JFB.

2. Summary judgment is granted in favor of defendants and against plaintiffs in CV 85–150–BLG–JFB.

3. Upon review of the plaintiff's motion for summary judgment with respect to the counterclaims raised by defendant Meridian Minerals Company in CV 85–115–BLG–JFB, the Court desires to hear oral arguments and the same shall be heard before the undersigned on Friday, November 20, 1987, at 10:00 o'clock a.m., Federal Building, Courtroom I, Billings, Montana.

The Clerk is directed forthwith to enter Judgment for defendants and against plaintiffs in CV 85–150–BLG–JFB. Entry of Judgment in CV 85–115–BLG–JFB shall be delayed until resolution of the counterclaims.

The Clerk is directed to notify counsel for the respective parties of the filing of this Order and accompanying Memorandum Opinion.