**LODGE TOWER CONDOMINIUM ASSOCIATION and Town of Vail, Plaintiffs,**

v.

**LODGE PROPERTIES, INC.; Western Land Exchange Company; Clayton Yeutter, Secretary, United States Department of Agriculture; F. Dale Robertson, Chief, United States Forest Service; Manual Lujan, Jr., Secretary, United States Department of the Interior; Gary E. Cargill, Regional Forester, Rocky Mountain Region, United States Forest Service; and Neil F. Morck, State Director, Bureau of Land Management, United States Department of the Interior, Defendants.**

No. 89 N 1098.

United States District Court,
D. Colorado.

March 31, 1995.

Charles White of Brownstein Hyatt Farber & Strickland, Denver, CO, Lawrence A. Eskwith, Town Atty., Town of Vail, Vail, CO, for plaintiffs.

James S. Bailey, Jr. of Bailey, Harring & Peterson, P.C., Robert D. Clark, U.S. Atty., Denver, CO, Pauline Milius, Dept. of Justice, Washington, DC, for defendants.

### MEMORANDUM OPINION AND ORDER

NOTTINGHAM, District Judge.

This litigation arises from an effort by the United States Forest Service (an agency in the United States Department of Agriculture) to exchange a two-acre parcel of federal land—administered by the Forest Service

**1374**

but lying entirely within the boundaries of the Town of Vail (a Colorado municipal corporation)—for a 385–acre parcel of privately-owned land lying within the boundaries of the Eagles Nest Wilderness Area. Plaintiff Lodge Tower Condominium Association ("Lodge Tower") is an unincorporated association representing owners of condominiums constructed on land adjacent to the two-acre parcel. Lodge Tower and the Town of Vail ("Vail") initiated this action to review the agency proceedings which culminated in the land exchange and to rescind the United States' issuance of a patent conveying the two-acre parcel to a private owner, Defendant Lodge Properties, Inc. ("Lodge Properties"). A second defendant, Western Land Exchange Company ("Western Land"), acted as Lodge Properties' agent in pursuing negotiations and administrative proceedings leading to the land exchange. All remaining defendants are federal officials involved in issuing the patent to the two-acre federal parcel or in making the decisions which led to the issuance of the patent. They will be referred to, collectively, as "the federal defendants." Jurisdiction is premised upon 28 U.S.C.A. § 1331 (West 1993).

Procedurally, the matter is before the court on several motions. These motions were referred to a magistrate judge, 28 U.S.C.A. § 636(b)(1)(B) (West 1993), and the magistrate judge has made recommendations concerning the motions. The private defendants, Lodge Properties and Western Land, have filed a motion to dismiss and a motion for summary judgment. Plaintiffs and the federal defendants have filed motions for *partial* summary judgment. A motion for *partial* summary judgment suggests that, even if the court resolves the motion entirely in favor of the movant, some issues will remain for future adjudication. The parties who seek partial summary judgment here do not specify what those issues are or why, in a case seeking judicial review of administrative action, *any* issue should remain for future adjudication, at trial or otherwise. Before addressing the facts and merits of the case, I must therefore attempt to clarify the procedural posture of the case.

■ When a federal district court is asked to review agency action under the Administrative Procedure Act, 5 U.S.C.A. §§ 701–706 (West 1977), its function is different from the function it performs in most cases which come before it, for it does not sit as a finder of fact. Instead, it reviews the record compiled before the administrative agency under the standards articulated in 5 U.S.C.A. § 706. *National Law Ctr. v. Department of Veteran Affairs*, 736 F.Supp. 1148, 1152 (D.D.C.1990). *See also Deukmejian v. Nuclear Regulatory Comm'n*, 751 F.2d 1287, 1323–27 (D.C.Cir.1984). Although there may be unusual cases where the court will have to determine what was before the agency, *e.g.*, *Natural Resources Defense Council, Inc. v. Train*, 519 F.2d 287, 291–92 (D.C.Cir.1975), that does not appear to be the case here. Despite some initial skirmishing concerning the adequacy of the administrative record before the court, the record has now been supplemented, and no party questions the content or completeness of that record in the latest round of briefing and objections.

■ Because a district court's function in reviewing administrative action is different from the function it usually performs as a trier of fact, some of the procedures designed to prepare a case for trial do not work well when the court is reviewing agency proceedings. Specifically, a motion for summary judgment under rule 56 of the Federal Rules of Civil Procedure—especially a motion for *partial* summary judgment—makes no procedural sense when a district court is asked to undertake judicial review of administrative action. Such a motion is designed to isolate factual issues on which there is no genuine dispute, so that the court can determine what part of the case must be tried to the court or a jury. *Nickol v. United States*, 501 F.2d 1389, 1392 (10th Cir.1974). Agency action, however, is reviewed, not tried. Factual issues have been presented, disputed, and resolved; and the issue is not whether the material facts are disputed, but whether the agency properly dealt with the facts. Only recently, the United States Court of Appeals for the Tenth Circuit has followed *Nickol* and cautioned, "When acting as a court of appeal, it is improper for a district court to use methods and procedures designed for trial."

*Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1564 (10th Cir.1994).

■ In accordance with my understanding of *Nickol* and *Olenhouse,* I will disregard the procedural posture in which the parties have placed the case. Instead, I will treat plaintiffs' complaint, their motion, and all material filed in support thereof as argument in support of their position that the agency action here should be set aside. Conversely, I will treat the federal defendants' motion and materials in support thereof as argument in support of their position that the agency action should not be set aside. The private defendants' motions do not directly discuss the propriety of the agency's action here. These defendants, rather, question whether the court has jurisdiction to set aside or otherwise interfere with the land patent which Lodge Properties received in the exchange, even if the agency action were set aside. I will therefore deal with these motions after discussing the administrative proceedings.

## I.

### FACTUAL BACKGROUND

Lodge Properties acquired, from unrelated third parties, a purchase option on 385 acres of privately-held land lying within the boundaries of the Eagles Nest Wilderness area (hereafter called "the wilderness land"). Lodge Properties then exercised the option and exchanged the wilderness land for 2.07 acres of federal land (hereafter called "the lodge parcel"). The lodge parcel is physically within Vail's town limits. It is next to land owned by plaintiff Lodge Tower and other land owned by defendant Lodge Properties. The lodge parcel was appraised and reappraised during the administrative process, and the appraisal which the United States Forest Service (the "agency") finally accepted set a value of $915,000. The wilderness land was appraised at $770,000, and Lodge Properties thus paid the United States $145,000 in cash to equalize the value of the exchange.

The land exchange was first proposed late in 1983. The agency thereafter conducted the required studies, made the required notifications, and received extensive public comment. Beginning on January 31, 1986, and continuing through November 8, 1988, the proposed land exchange was the subject of four successive notices of decisions by the agency's regional forester. Each decision was administratively appealed. The extensive administrative record, upon which the parties were finally able to agree, details this administrative process in punishing detail. The magistrate judge assigned to make recommendations on the motions in question has accurately outlined this record. *See* Recommendation of United States Magistrate Judge at 2–8. There is no need to repeat the magistrate judge's discussion here, and it is hereby adopted as a part of this Memorandum Opinion and Order. To capsualize the administrative history: the regional forester's first Decision Notice and Finding of No Significant Impact ("DN") was made on January 31, 1986. It was reversed because the agency perceived defects in the environmental assessment ("EA") on which it was based. The second DN, accompanied by another EA, was issued on June 19, 1986. On review, the agency determined essentially that the DN was premature because the lodge parcel had not been appraised. An appraisal was done, and the regional forester issued his third DN on September 17, 1987. On review, the agency concluded that the appraisal was inadequate, and a new appraisal was ordered. The reappraisal was done, and the regional forester issued his fourth (and last) DN on November 8, 1988. This decision was also appealed.

After these years of administrative review, the Associate Deputy Chief of the National Forest System approved the land exchange on June 16, 1989. *R., Vol. I at 199.* The Assistant Secretary of Agriculture declined further administrative review on June 26, 1989, at 10:20 a.m. (EST). *R., Vol. II at 413.* On the same day, at approximately 8:30 a.m. (MST), after the Assistant Secretary of Agriculture had declined further review of the Associate Deputy Chief of the National Forest System's approval of the land exchange, the United States placed its land patent to the lodge parcel into a prearranged escrow. The exchange of title to the lodge parcel and

the wilderness land occurred at 8:38 a.m. (MST) and was recorded at approximately 9:10 a.m. (MST). *See Private Defs.' Mot. for Summ. J. to Dismiss for Failure to Join Indispensable Parties,* Affidavit of Daniel E. Pike.

At 9:10 a.m. (MST) on June 26, 1989, plaintiffs filed this action seeking review of the land exchange under the Administrative Procedures Act ("APA"), and an injunction against transfer of the properties. Since title had already passed, however, plaintiffs later filed a First Amended and Supplemental Complaint (the "Complaint"), seeking APA review and recision of the land exchange. This Complaint sets forth eleven "claims" for relief, but this nomenclature is simply further evidence of plaintiffs' confusion regarding the procedural nature of a complaint for judicial review of administrative action. The first nine "claims" simply specify various perceived deficiencies in the United States' administrative procedures. The tenth claim seeks a judgment declaring the parties' respective rights and obligations. *See* 5 U.S.C.A. § 703 (West 1977) (judicial review of administrative action may take form of request for declaratory judgment). The eleventh claim seeks imposition of a trust on Lodge Properties' title to the lodge parcel. Plaintiffs also seek (1) an order rescinding the land exchange and (2) a mandatory injunction directing that the lodge parcel be reconveyed to the United States.

## II.

### DISCUSSION

#### A. *Standard of Review*

To the extent that agency action is reviewable at all (a question I will reach momentarily), the standard of review is expressly set forth in the APA. The applicable part of that standard is as follows:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or appli-

cability of the terms of an agency action. The reviewing court shall—

> . . . . .

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>> (B) contrary to constitutional right, power, privilege, or immunity;
>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or]
>> (D) without observance of procedure required by law[.]

> . . . . .

> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C.A. § 706.

"The 'arbitrary or capricious' concept, needless to say, is not easy to encapsulate in a single list of rubrics because it embraces a myriad of possible faults and depends heavily on the circumstances of the case." *Puerto Rico Sun Oil Co. v. EPA,* 8 F.3d 73, 77 (1st Cir.1993). The case law nonetheless describes the approach which a reviewing court must take. Consistent with the introductory language of section 706, the court must first look at the relevant statute to determine whether the administrative agency properly construed its authority and acted within the scope of that authority. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Next, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. [Citations omitted.] Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.,* 401 U.S. at 416, 91 S.Ct. at 823–24. In evaluating the agency's factual

findings and inferences, the "court must find that the evidence before the agency provided a rational and ample basis for its decision." *Northwest Motorcycle Ass'n v. United States Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). If the agency relies on a factual finding or assumption which the court regards as clearly erroneous, application of the "arbitrary or capricious" standard requires that the court set aside the agency action only if "there is a significant chance that but for the errors the agency might have reached a different result." *Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1456 (10th Cir.1994) (*quoting National Parks and Conservation Ass'n v. FAA*, 998 F.2d 1523, 1533 [10th Cir.1993]). With this standard of review in mind, I now turn to plaintiffs' arguments.

## B. Administrative Deficiencies Alleged by Plaintiffs to Require That Agency Action Be Set Aside

### 1. Plaintiffs' contention that the land exchange was not in the public interest

 In their first "claim for relief," plaintiffs argue that the land exchange is not in the public interest, as required by the pertinent parts of the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C.A. § 1716(a) (West 1986), and the General Exchange Act, 16 U.S.C.A. § 485 (West 1985). The authorizing statute provides as follows:

[A] tract of land ... within the National Forest System may be disposed of by exchange by the Secretary of Agriculture under applicable law where the Secretary ... determines that the public interest will be well served by making that exchange: *Provided,* That when considering public interest the Secretary ... shall give full consideration to better Federal land management and the needs of State and local people, including needs for lands for the economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife and the Secretary ... finds that the values and the objectives which Federal lands or interests to be conveyed may serve if retained in Federal ownership are not more than the values of the non-Feder-

al lands or interests and the public objectives they could serve if acquired. 43 U.S.C.A. § 1716(a). Similarly, the General Exchange Act permits such an exchange "[w]hen the public interests will be benefitted thereby." 16 U.S.C.A. § 485. FLPMA explicitly reflects the congressional intent that "judicial review of public land adjudication decisions be provided by law." 43 U.S.C.A. § 1701(a)(6). Thus, this court has the authority to review the Secretary's decision to determine whether it complied with these explicit statutory standards. *National Coal Ass'n v. Hodel*, 617 F.Supp. 584, 588 (D.D.C. 1985), *aff'd,* 825 F.2d 523 (D.C.Cir.1987).

[9] Defendants preliminarily argue that plaintiffs cannot raise the public interest issue now because plaintiffs failed to raise the issue in the administrative proceedings. *See Wilson v. Hodel*, 758 F.2d 1369, 1373 (10th Cir.1985). I agree with the magistrate judge's view of this argument. *See* Recommendation of United States Magistrate Judge at 12. The administrative record indicates that plaintiffs did indeed raise this issue. In addition to the instances cited by the magistrate judge, I note that local opposition to the land exchange was documented in the form of petitions from the townspeople opposing the land exchange. *R., Vol. VI at 159.* The record also contains a letter from Vail's mayor raising numerous issues concerning the exchange. *R., Vol. VI at 25–32.* While these materials did not use the verbal talisman, "public interest," they either address and/or reflect some of the matters which the agency is expressly required to consider under section 1716(a) in deciding whether an exchange is in the public interest. I find and conclude that the issue was sufficiently raised during the administrative proceedings.

 Defendants next urge that there can be no judicial review of the administrative determination that the exchange is in the "public interest," because the action "is committed to agency discretion by law." 5 U.S.C.A. § 701(a)(2). The magistrate judge appeared to indicate partial agreement, relying on decisions from the Sixth Circuit and the Ninth Circuit for the proposition that public interest findings made in connection

with federal land exchange decisions are unreviewable. Those cases, however, are not persuasive, because they were decided before Congress enacted FLPMA in 1976. As noted earlier, FLPMA expressly provides for judicial review of public land adjudication decisions, 43 U.S.C.A. § 1701(a)(6); section 1716(a) (quoted above) lists the considerations which must guide the agency in making exchanges. In contrast to the narrow set of circumstances where a matter is committed to agency discretion because "there is no law to apply," *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. at 410, 91 S.Ct. at 821, FLPMA does provide legal criteria by which to review the agency decision—as the magistrate judge ultimately concluded. *See* Recommendation of United States Magistrate Judge at 14.

■■■■ Application of the legal criteria set forth in section 1716(a) brings me to defendants' next contention, the argument that the agency determination finding the exchange to be in the public interest was not arbitrary or capricious, nor an abuse of discretion. The primary issue is whether the agency properly weighed the considerations set forth in section 1716(a). The first consideration listed is "better Federal land management," and the record discloses that this consideration weighed heavily in the agency decision. *See R., Vol. VI at 115.* The Land and Resources Management Plan for the White River National Forest (the national forest which encompasses all of the land exchanged in this transaction) places a priority on federal acquisition of privately-held realty lying within wilderness areas. *R., Vol. VI at 1–2.* The 385–acre wilderness parcel (which actually consisted of two tracts located less than a mile from one another) was "the largest remaining private inholding in the Eagles Nest Wilderness," and its acquisition was therefore made the highest priority. *R., Vol. VI at 100.* The Environmental Assessment ("EA") of June 19, 1986, recites the physical characteristics of the parcel in detail, stating that the ground is traversed by the Piney River and Meadow Creek (habitat for the Colorado River cut-throat trout, a fish on the Colorado endangered species list), that it contains two acres of wetlands and four acres of floodplain, and that it was used extensively by the public for hunting, hiking, and camping. *R., Vol. VI at 101.* The EA concludes:

> Acquisition of these parcels would facilitate management of the wilderness area.... By acquiring fee title to these parcels, the Forest Service would eliminate chances for inappropriate development of these private parcels ... thereby achieving a primary objective for this ... area. The management objective cannot be achieved through a partial interest acquisition since any level of development will conflict with Wilderness management objectives.

*R., Vol. VI at 94–95.*

The Land and Resources Management Plan for the White River National Forest also classifies certain lands for disposal. *R., Vol. VI at 1.* Although the district ranger had suggested that the lodge parcel be considered for disposal, there had been no formal action on the proposal at the time this exchange was proposed. *R., Vol. VI at 99.* The land is on a predominantly steep slope between the Vail Mountain ski area and the Lodge at Vail. It contains no wetlands and is subject to frequent disturbances related to use of roads, ski runs, and adjacent urban land. The EA also recites the physical characteristics of the lodge parcel and its uses. *Id.* Based on this analysis, the EA concludes that disposal of the lodge parcel "will significantly benefit management efficiency of the White River National Forest." *R., Vol. VI at 93.*

As the foregoing narration suggests, the agency, in the course of considering better federal land management, also weighed other factors enumerated in section 1716(a). Recreational concerns are addressed, *R., Vol. VI at 93,* as are concerns about wildlife and fish, *R., Vol. VI at 99.* The need of either the wilderness land or the lodge parcel for the production of food, fiber, or minerals was not addressed, since it is clear from the record that these considerations were irrelevant. When viewed as a whole, the record abundantly supports the agency's conclusion that this land exchange is in the public interest. Approximately two acres of federal land—on a slope adjacent to Vail's highly developed condominium area, devoid of wet-

lands, possessing no value for fish life, and having insignificant value for other wildlife—was exchanged for 385 acres of wilderness land—containing wetlands, streams, and an endangered species of fish—in order to supplement the Eagles Nest Wilderness Area.

The January 31, 1986, "Decision Notice and Finding of No Significant Impact," which was subsequently replaced by the June 16, 1986, decision discussed in the preceding paragraphs, similarly considered public interest concerns, *R., Vol. VII. at 5.* So did the September 17, 1987, "Decision Notice and Finding of No Significant Impact." *R., Vol. I at 177–81.* The methodology employed by the agency, and the assumptions made therein, must be sustained if reasonable. *National Coal Ass'n v. Hodel,* 675 F.Supp. 1231, 1244 (D.Mont.1987), *aff'd,* 874 F.2d 661 (9th Cir.1989). It is clear that throughout this lengthy administrative process the agency adequately considered the public interest criteria set forth at 43 U.S.C. § 1716(a). Consequently, its decision that the land exchange was in the public interest was not arbitrary, capricious, or an abuse of discretion.

The magistrate judge, in recommending a contrary result, seems to have focused on perceived inadequacies in the agency's consideration of the one section 1716(a) criterion which I have not yet discussed—"the needs of State and local people, including needs for lands for the economy[ ] [and] community expansion." Specifically, the magistrate judge concluded that the agency's public interest determination "was premised in substantial part on an assumed use of the Lodge Parcel for additional hotel accommodations." Recommendation of United States Magistrate Judge at 15. As the administrative process wore on, this assumed use, first mentioned in the EA which was a part of the Decision Notice and Finding of No Significant Impact issued by the regional forester on June 19, 1986, changed. It changed primarily as a result of the reappraisal process required by intervening administrative decisions in the case. By the time the regional forester made his fourth (and last) Decision Notice and Finding of No Significant Impact (on November 8, 1988), he had accepted an appraised valuation which assumed that the lodge parcel would be zoned to permit "primary/secondary residential use with ski in/ski out access." *R., Vol. I at 196.* This factual inconsistency between land use assumed in the June 19, 1986, EA (which was never revised and thus remained as one basis for the November 8, 1988, Decision Notice and Finding of No Significant Impact) and land use assumed in reappraisal of the property (which was also a basis for the November 8, 1989, Decision Notice and Finding of No Significant Impact) led the magistrate judge to characterize use of the property for development of a hotel as "speculative[,] . . . illusory[,] . . . [or] largely fictional." Recommendation of United States Magistrate Judge at 17–18. Because of the procedural posture in which the case came before him, the magistrate judge merely recommended that the federal defendants' motion for partial summary judgment be denied. He did not confront the question whether the administrative inadequacies which he perceived rose to a level which justified setting aside the agency action.

The question which the court must address, in the case as it has been procedurally re-postured, is whether the problem described by the magistrate judge rendered the agency decision arbitrary, capricious, or an abuse of discretion. Having reviewed the record in light of the magistrate judge's recommendation, I still conclude that the agency decision is not arbitrary, capricious, or an abuse of discretion. To the extent that the agency did discuss and consider the potential use of the lodge parcel for a 100–unit hotel, I do not think the error so tainted the agency's weighing of the section 1716(a) considerations that the agency made a clear error of judgment.

In general, I think both plaintiffs and the magistrate judge (1) overstate the degree of inconsistency between the EA of June 19, 1986, and the later reappraisal and (2)—partly as a consequence of this overstatement—overestimate the importance which the agency's decision attached to the lodge parcel's possible use for construction of a hotel. The administrative record discloses the agency's continuous awareness that past and future use of the lodge parcel would

depend heavily on zoning and land use decisions made by local officials. (Ironically, it appears that the bulk of these decisions will be made by Vail, one of the plaintiffs here.) Lodge Properties and Western Land have always manifested an intent to develop the lodge parcel as a hotel. That intent was acknowledged in the regional forester's decision of June 19, 1986, *R., Vol. VI at 116,* and this acknowledgment was repeated in the regional forester's last decision of November 8, 1988, *R., Vol. I at 194.* The EA underlying both documents, however, demonstrates full awareness of the fact that proposed use of the lodge parcel for erection of a hotel would depend upon negotiations between Lodge Properties and the Town of Vail and, ultimately, upon Vail's own zoning decisions:

> The proponent [Western Land] has made two proposals to the Town of Vail to insure low density on the Spraddle Creek parcel [which was later eliminated from the land trade] in exchange for Town assurances of higher density zoning on the Lodge parcel. ... Development of either the Spraddle Creek parcel or the Lodge parcel after any conveyance by the United States will be subject to comprehensive zoning and land use ordinances.... These ordinances will mitigate any impact on the human environment by *limiting the magnitude of any subsequent development of the proponent of the land exchange.*

*R., Vol. VI at 95.* (Emphasis added.) The EA later notes that "[a]pproximately 100 hotel rooms will be added <u>if</u> the proposed use of the parcel is approved by the Town." *R., Vol. VI at 93.* (Underscoring in original.) Even though the EA later avers that the most significant positive benefit of trading the lodge parcel would be the economic benefit of hotel development, this averment is still qualified by characterizing it as a "potential[ ]" benefit. *R., Vol. VI at 91.* In view of the agency's clear awareness that hotel use was problematic and depended on the agreement of apparently hostile town officials, and in view of the qualified prediction that development of the site as a hotel was a *potential* positive benefit, I must disagree with the magistrate judge's view there is a critical and fatal contradiction between the EA's suggestion that development as a hotel site was a

potential benefit and the reappraisal's assumption that the lodge parcel's most likely use in private hands would be low-density residential development.

 It appears to the court that plaintiffs and the magistrate judge also overestimate the importance which the agency's decision attached to the lodge parcel's potential use. Section 1716(a) requires merely that the agency consider and weigh the factors which are listed in the section. It does not give the factors any particular priority, nor does it require the agency to do so. As I have previously stated, the agency chose to give paramount importance to the advantages which this land exchange afforded for better federal land management, recreation, fish, and wildlife. The agency did not fail or refuse to consider the needs of local people or local economic impact. *R., Vol. VI at 91–93.* It simply attached much less importance to these factors than it did to the other ones. Given the agency's approach, and given the facts supporting its conclusions concerning land management, recreation, fish, and wildlife, I conclude that, even if the agency's factual assumption concerning use of the relinquished land were erroneous, there is no "significant chance that but for the errors the agency might have reached a different result." *Mount Evans Co. v. Madigan,* 14 F.3d at 146. The agency's ultimate public interest determination does not reflect a clear error in judgment and is thus not a ground for setting the agency action aside.

2. **Plaintiffs' contention that the agency violated statutory requirements that the lodge parcel and wilderness land be equal in value or that the value of the exchange be equalized by payment of money**

 FLPMA requires that, when non-federal lands are exchanged for federal lands, the "values of the lands exchanged ... either shall be equal, or if they are not equal, the values shall be equalized by the payment of money to the grantor or to the Secretary concerned as the circumstances require...." 43 U.S.C.A. § 1716(b) (West 1986). In their "second claim for relief," plaintiffs contend that the agency violated this provision. They

claim that the lodge parcel ceded by the United States was more valuable than indicated by the agency's appraisal. Plaintiffs argue that the agency's appraisal used an improper local zoning classification, which had the effect of depressing the value of the lodge parcel. Thus, plaintiffs argue, the lodge parcel was not appraised consistent with its highest and best use, as required by Forest Service Appraisal Handbook Valuation Guideline 5409.12, § 1.12 (*Br. in Supp. of Pls.' Mot. for Summ. J.*, Ex. B) and a United States Department of Justice booklet entitled "Uniform Appraisal Standards for Federal Land Acquisitions," *R., Vol. IV at 345a–345dd.* Plaintiffs argue that the appraiser considered the land as if it were zoned for "primary/secondary residential," and that it should have been considered as "commercial core 1 district."

 The magistrate judge, after a thorough analysis of the issue, concluded that plaintiffs lacked standing to advance this argument. Citing Colorado statutory and decisional law, as well as cases from other states, the magistrate judge demonstrated, as a matter of law, that the value assigned to a parcel in a land exchange cannot be used to establish value of adjoining parcels, nor can it be used in making a property tax assessment. He also noted that plaintiffs had failed to show that actual or assessed property values had decreased as a result of this transaction. Perhaps the most conclusive item of evidence in the record on this point is the affidavit of the Eagle County assessor, which states that the assessed fair market value of the lodge parcel for 1989 was $3,606,760 and that *the assessor did not take zoning into account in setting this value.* Accordingly, I am in full agreement with the magistrate judge's conclusion that plaintiffs do not have standing to challenge the agency's equal value determination.

Since I have had to review the agency's appraisal process anyway, I reach the merits and alternately hold that the agency action was not arbitrary, capricious, or an abuse of discretion. The administrative record reveals that the initial appraisal of the lodge parcel was done by Raymond Hart. His first report was submitted to the agency on Au-

gust 3, 1987. It estimated the value of the lodge parcel to be $600,000 as of May 15, 1987. *R., Vol. V at 202–74.* One of the four appeals in the case centered on Mr. Hart's conclusions. This appeal required a reappraisal, since the agency concluded that the valuation guidelines had not been met, *R., Vol. I at 188–91.* Specifically, the agency concluded that Mr. Hart had not considered the value of the property as if it were to receive a zoning designation similar to the designation given nearby private property. On July 8, 1988, written appraisal instructions were issued to the appraiser, requiring that the appraisal be redone. *R., Vol. IV at 432–34.*

The second appraisal was completed on November 1, 1988. *R., Vol. IV at 346–411.* The value of the lodge parcel was reappraised at $915,000. This reappraisal was reviewed and subsequently approved by the regional office reviewer on November 2, 1988. *R., Vol. IV at 418–27.* The regional forester's determination of this valuation was affirmed by the Associate Deputy Chief of the National Forest System in his June 16, 1989, decision. *R., Vol. I at 198–99.*

The July 8, 1988, instructions stated that Mr. Hart should reappraise the land considering higher uses, zoning, and political influences. *R., Vol. IV at 432–34.* Mr. Hart considered zoning in his reappraisal. He reappraised the lodge parcel as if it were zoned for "primary/secondary residential." He determined that this zoning classification was the highest and best use of the property and that, as a result of political influences in the Town of Vail, the property would not be rezoned:

> The current primary/secondary zoning of the subject is legal and consistent with adjacent zoning. No history of upzoning similar to that necessary to allow commercial uses on the subject property exists. Case history shows density increases are difficult to obtain. Therefore, the appraiser concludes there is no evidence to show the political feasibility of upzoning of the subject property for a free-standing hotel is reasonably probable.

*R., Vol. IV at 384.*

The Forest Service Review Appraiser, Donald E. Howell, stated in his November 2,

1988, appraisal review report that Mr. Hart complied with the instructions for reappraisal, and that the appraiser adequately supported his position that the lodge parcel would not be rezoned. *R., Vol. IV at 418–27.* The Associate Deputy Chief of the National Forest System, on June 16, 1989, stated that the appraisal was completed by an independent qualified appraiser, that the appraiser's work was reviewed by review appraisers who conducted on site reviews, and that the reviewers concurred with the appraiser's value estimate. *R., Vol. I at 198–99.* As the Uniform Appraisal Standards for Federal Land Acquisition note, appraising is not an exact science, and reasonable people may differ somewhat in arriving at an estimate of fair market value. *R., Vol. IV at 345Y.* The record clearly shows that the Forest Service considered the Forest Service Agency Appraisal Guidelines and 43 U.S.C. § 1716(b) in its appraisal determinations. Plaintiffs have failed to demonstrate that the agency made a clear mistake in judgment in handling the appraisal process, and their challenge to the appraisal supplies no reason to set aside agency action.

### 3. Plaintiffs' contention that the agency violated its own guidelines for processing land exchanges by proceeding on a stale appraisal

In their "fifth claim for relief," plaintiffs argue that the agency violated its own guidelines for processing land exchanges. Plaintiffs argue that the offered non-federal land (the wilderness parcel) should have been reappraised, once the agency remanded for a reappraisal of the federal land. Plaintiffs argue that the appraised value of the non-federal land set forth in the May 11, 1988, exchange agreement, *R., Vol. 1 at 284,* was valid for only one year, and that this period had expired when the federal land was reappraised. *See Compl. at 20.* Because of the magistrate judge's resolution of the standing question, he did not reach this issue. I do reach the issue, consistent with my attempt to resolve the merits as an alternate basis for decision.

I do not find plaintiffs' argument persuasive. The internal agency guideline which plaintiffs cite at the referenced page of the Complaint says that an appraised value is valid for only one year, *unless fixed by an exchange agreement.* The May 11, 1988, Exchange Agreement between Lodge Properties and the United States fixes a value of $770,000 for the non-federal wilderness parcel. *R., Vol. 1 at 282.* This agreement was conditioned on favorable resolution of the pending administrative appeal. As plaintiffs observe, that very appeal required reappraisal of the federal land, and plaintiffs somehow conclude that this circumstance similarly required reappraisal of the non-federal wilderness parcel. This is simply not the case. The May 11, 1988, Exchange Agreement was made in circumstances where both parties were aware of an appeal which could invalidate the agency's appraisal, and the agreement is expressly conditioned on the outcome of the pending appeal. There is no similar provision allowing Lodge Properties to set a new value on the wilderness parcel. The agency acted in accordance with its own guidelines in not requiring a reappraisal of the wilderness parcel, since the value of that property was fixed by the agreement of May 11, 1988.

### 4. Plaintiffs' contention that the Environmental Assessment (EA) was insufficient and that an Environmental Impact Statement (EIS) was necessary

In the National Environmental Policy Act ("NEPA"), Congress has mandated that "major Federal actions significantly affecting the quality of the human environment" must be accompanied by a "detailed statement" covering certain broad topics set forth in the Act. 42 U.S.C.A. § 4332(2)(C) (West 1994). In regulations implementing NEPA, this detailed statement is called an "environmental impact statement" ("EIS"). 40 C.F.R. § 1508.11 (1994). When an agency proposes any sort of action, it must decide whether the action is a "major" one which "significantly affects the human environment." The Council on Environmental Quality established by NEPA has promulgated an extensive set of regulations to govern federal agencies in making this basic decision. Unless the action falls within a "categorical exclusion" established by the agency, 40 C.F.R. §§ 1508.4,

1507.3, these regulations require the agency to prepare an "environmental assessment" ("EA") to determine whether the proposed action significantly affects the human environment. 40 C.F.R. § 1508.9. If the agency determines that there will be a significant impact, then it must prepare a full EIS. If it determines that there will be no significant impact, then it must issue a brief written "finding of no significant impact" ("FONSI"). 40 C.F.R. § 1508.13.

The regional forester determined, during the course of each appeal and remand in this case, that the proposed land exchange would have no significant impact on the human environment. The first appeal of the regional forester's decision resulted in a reversal of the decision, this reversal being premised on a determination that there were deficiencies in the EA on which it was based. A new EA was prepared. That EA, which I have already discussed, accompanied the regional forester's second decision, made on June 19, 1986. This EA was never supplemented or modified, and it remained the basis for all later decisions finding there was no significant impact on the human environment. It is therefore the key NEPA document in the case, on the basis of which the agency's compliance with NEPA must be judged.

 Like the other agency decisions in this case, the various findings of no significant impact, and the 1986 EA on which they were all based, are reviewed under the "arbitrary and capricious" standard. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 375–78, 109 S.Ct. 1851, 1860–61, 104 L.Ed.2d 377 (1989). The court's role is to examine whether the agency's conclusion that the exchange will have no significant environmental consequences was reasonable. *Park County Resource Council, Inc. v. United States Dep't of Agric.,* 817 F.2d 609, 621 (10th Cir.1987). After reviewing the administrative record, I hold that the Forest Service took the requisite "hard look" at the land exchange, *id.* at 622, and that this exchange was not arbitrary, capricious, or an abuse of discretion.

Plaintiffs attack the EA on several grounds. They contend that the EA did not address: (1) anticipated uses of the land

ceded, or environmental consequences of the land exchange, 40 C.F.R § 1502.16; (2) alternatives to the land exchange, 40 C.F.R. § 1502.14; or (3) cumulative impacts of this land exchange, 40 C.F.R. § 1508.7. The administrative record, however, belies these contentions. For example, the anticipated uses and environmental consequences, are discussed in *R., Vol. VI at 91–93, 95, and 103.* Alternatives are discussed at *R., Vol. VI at 103.* Cumulative effects of this land exchange are discussed at *R., Vol. VI at 89,* and mitigation of problems from the land exchange is discussed at *R., Vol. VI at 91–93.* Public review occurred throughout this process. *R., Vol. VI at 5–6.* A reviewing court must remember that the EA is not a full-blown EIS. The EA need only briefly provide evidence and analysis sufficient to determine whether an EIS is necessary. 40 C.F.R. § 1508.9(a)(1); 40 C.F.R. § 1501.4(c). The 1986 EA fulfills these requirements.

The magistrate judge accepted two of plaintiffs' arguments, recommending that the federal defendants' motion for partial summary judgment be denied, that plaintiffs' motion for partial summary judgment be granted, and that the ultimate finding of no significant impact be deemed arbitrary and capricious. Recommendation of United States Magistrate Judge at 28–30. First, the magistrate judge was persuaded by plaintiffs' contention that the EA mistakenly identified the most probable use of the parcel as a site for a hotel, a supposition which was erroneous in light of the agency's own appraiser's opinion (ultimately accepted by the agency) that zoning to permit such a use was unlikely and that the highest and best use was probably primary/secondary residential development. Second, he concluded that the EA's failure to consider the possible relocation of an easement styled "Mill Creek Road" on the lodge parcel was a fatal flaw.

 Although the mere act transferring title to federal land by issuance of a land patent has no impact on the environment, courts have recognized that the transferee may plan some action which will significantly affect the environment and which could not occur without the transfer of the land. The agency cannot turn a blind eye to the trans-

feree's plan. It has "an affirmative duty . . . to receive assurances of the plans of the private developer prior to the exchange." *National Forest Preservation Group v. Butz*, 485 F.2d 408, 412 (9th Cir.1973); *Lockhart v. Kenops*, 927 F.2d 1028, 1033 (8th Cir.1991). The agency tried to perform this duty here, but the magistrate judge thought its analysis was flawed because the proposed use of the lodge parcel as a hotel site was wholly unrealistic.

I cannot agree that the agency's analysis of the lodge parcel's probable use was flawed. As I noted earlier, the EA did study this proposed use and the environmental impacts thereof. As the agency's fact finding over the next two years began to reveal that such intensive use was unlikely, the agency eventually concluded (in its valuation reviews) that the most probable use was for construction of primary/secondary residences. The EA was not modified or supplemented to reflect this metamorphosis in the agency's assessment. Lodge Properties, however, never abandoned its development proposal. It continued to press for the more intensive use of the parcel as a hotel site, and the agency's use of the developer's proposed use as the basis for its analysis was fully consistent with *Butz* and *Lockhart*.

Even if the agency was mistaken in continuing to base its EA on the assumption that the lodge parcel would be used as a hotel site, I cannot agree that the agency was required to supplement the EA by including another section which analyzed the alternate use of the property for construction of two primary/secondary residences. There are two reasons for my position. First, the agency analyzed the environmental effects of Lodge Properties' proposed 100–unit hotel development in terms of its impact on traffic congestion in Vail, air quality, water quality, and parking. It concluded that the impact would be insignificant. *R., Vol. VI at 91–93.* Use for two primary/secondary residences (as assumed by the appraisal) would be a less intensive use, involving fewer people, than use as a hotel site. It is, I conclude, extremely unlikely that this less intensive use would cause a greater impact on the matters which the agency analyzed or that the less

intensive use would raise separate, new environmental issues. If the agency decided that there would be no significant impact from the construction of a 100–unit hotel, it is impossible to imagine that it would find a significant impact from the construction of two primary/secondary residences. Supplementation of the EA to include a separate analysis of primary/secondary residential development would not have changed the agency finding of no significant impact, and any flaw in agency methodology does not undercut its final decision.

My second reason for not requiring the agency to have included a separate discussion of primary/secondary residential development in its EA is that *any* use of this land in private hands is heavily dependent on local zoning and land use decisions. While I doubt that federal agencies would be able to impose on local entities the burden or expense of mitigating any significant environmental impact, the agency can consider existing zoning, building, and view ordinances in evaluating whether an impact is so significant as to require an EIS, *Lockhart v. Kenops*, 927 F.2d at 1033, since those existing ordinances are part of the factual background against which the agency evaluation is made. That is exactly what the EA here did. Indeed, the agency's evolving assumptions about the most likely use of the lodge parcel (which form a significant part of the basis for Vail's challenge in this litigation) rest largely on the appraiser's prediction that the very zoning laws which the EA thought might limit development are probably going to have that exact effect. The EA's conclusion that any environmental impact of the transferee's proposed use could be adequately addressed through local land use decisions was simply not a mistake—much less a clear one.

■ The magistrate judge also thought the EA's failure to evaluate the impact of relocating an existing easement for Mill Creek Road to be a fatal omission. The federal defendants respond that (1) the EA did consider possible relocation of the easement and (2) plaintiffs failed to raise the issue during administrative proceedings. The arguments are both disingenuous. The federal defendants support the former by

claiming that there is a cryptic reference to "relocation of roads" in a 1985 agreement between Lodge Properties and Vail Associates, Inc., which agreement is itself attached as one of ten exhibits located in one of five appendices to the EA. *R., Vol. VI at 50.* This obscurity interred deep in the silt of irrelevancy does not suggest even fleeting awareness of the relocation issue by anyone in the agency.

Defendants' argument concerning plaintiffs' failure to raise the easement relocation issue is unavailing, for similar reasons. Relocation of the road was never mentioned or considered by the agency until the regional forester's fourth and final decision in the case. This decision was preceded by the appraiser's determination that the most likely use of the lodge parcel was for primary/secondary residential units. This determination was accompanied by the suggestion that the most desirable residential use would involve relocation of the road. *R., Vol. IV at 380.* Whether the appraiser's conclusion triggered recognition of the problem (as the magistrate judge supposed) or whether there was some other reason, the regional forester's decision of November 8, 1988, was premised on the following added condition:

3. Reserve in patent a perpetual easement for public access on the existing Mill Creek Road.... Provided, however, that Lodge Properties, Inc. shall have the right to relocate said access easements at the Lodge's sole expense, provided such relocation does not interfere with use of the road by the United States or the public.

*R., Vol. I at 193.* As the magistrate judge found, plaintiffs raised the issue which they now raise here when they appealed this last decision of the regional forester.

I do not believe that federal defendants can avoid the conclusions that (1) the provision allowing Lodge Properties to relocate Mill Creek Road was never a part of the agency's decision-making process until on or about November 8, 1988, and (2) the earlier EA never· addressed the environmental consequences of this relocation. The EA should have been supplemented to consider the potential effects of this action. Thus, the question which the court must address is whether this deficiency means that the finding of no significant impact is arbitrary, capricious, or an abuse of discretion. In dealing with this issue, I am mindful of the admonition that "[i]f the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985).

For several reasons, I conclude that the record before the court is adequate and that the EA's failure to address possible relocation of Mill Creek Road does not render arbitrary or capricious the agency's finding of no significant impact. First, relocation of the road is speculative. The sole mention of relocation is in connection with the United States' reservation of a perpetual easement in the property. Lodge Properties has certainly never proposed relocation, even in connection with a hotel development, and the reappraisal suggested merely that it was but one convenient way of developing the property for residential use. *R., Vol. IV at 364–77. Cf. Lockhart v. Kenaps,* 927 F.2d at 1035–36 (agency not required to consider possible use by subsequent purchaser where transferee of federal land had run out of money during long administrative process and was considering a resale). Second, I am satisfied on the record before me that the agency's consideration of the relocation issue would be highly unlikely to affect the finding of no significant impact. *See Mount Evans Co. v. Madigan,* 14 F.3d at 1456. There is nothing in the. agency proceedings which permits Lodge Properties to change the width of the road, to modify the nature of the easement, or to lighten the burdens which the United States, as holder of the dominant estate, could impose. I have examined the site maps which accompany the reappraisal of the property and which illustrate the one relocation which the appraiser thought might allow more convenient development, *R., Vol. IV at 357–58,* and I cannot conceive that remand of

this case for consideration of the relocation issue would result in a finding of significant impact and thereby necessitate preparation of an EIS. My conclusion is reinforced by the fact that the agency has clearly (and reasonably) suggested that existing local zoning and land use laws suffice to control development of the land.

### 5. Plaintiffs' miscellaneous remaining contentions concerning defects in the administrative process

Plaintiffs point out that the magistrate judge failed to rule on the motion for partial summary judgment pertaining to their sixth, seventh, and eighth "claims for relief." I also note that their ninth "claim" is apparently not the subject of any motion, but I think its lack of merit is apparent from the record. (Plaintiffs' fourth "claim for relief" was voluntarily "dismissed" on April 1, 1990.) It is convenient to group all of these remaining "claims" together, partly because I do not think that they provide any basis for relief, and partly because I think the rulings already made herein effectively moot the claims.

■ In their sixth "claim for relief," plaintiffs allege a denial of their right of administrative review. Specifically, plaintiffs argue that a June 2, 1989, document, *R., Vol. II at 403–05*, in which the forest service's regional director of lands certified that the land exchange met the requirements of law, even though the Associate Deputy Chief and the Assistant Secretary of Agriculture had not yet ruled on plaintiffs' appeal, somehow cuts short their administrative review. It is clear, however, that the federal defendants, Lodge Properties, Western Land, and the third-party owners of the wilderness parcel intended to do—and did—nothing more than take steps to expedite the exchange once the final agency decision was made. To this end, they agreed to escrow all closing documents and to close the transaction only after a final agency decision had been made. The administrative review continued, even though a patent was requested from, and issued by, the United States Bureau of Land Management. The key fact is that the patent was not delivered, and the escrow was not closed, until after the agency's decision had become final. The actions relating to the escrow and issuance of the patent were distinct from the continuing administrative review and did not deprive plaintiffs of their right to that review.

■ In their seventh "claim for relief," plaintiffs allege that defendants violated a stay providing that the deeds would not be exchanged until the agency had ruled on the merits of plaintiffs' appeals. *R., Vol. IV at 23, 30. See also* 36 C.F.R. § 211.18(h)(4)(i) (1994). I hold that no such violation occurred here. The Associate Deputy Chief of the National Forest System ruled on the merits of the appeal on June 16, 1989, stating that his decision "constitute[d] the final administrative determination of the Department of Agriculture unless the Secretary, on his own volition, [chose] to review the appeal." *R., Vol. IV at 607.* The Assistant Secretary declined to review the appeal on June 26, 1989. The stay was in effect until ten days after the agency's final administrative determination—that is, until June 26, 1989. It was not until June 26 that the exchange was closed and the documents recorded. The purpose of the stay was to allow an appeal to the Secretary of Agriculture. This appeal process occurred in this case, and it was complete when the Assistant Secretary declined to hear the appeal.

■ In their eighth "claim for relief," plaintiffs argue that the issuance of the land patent for the lodge parcel violated 43 U.S.C.A. § 1718 (1986), which discusses the issuance of patents by the Secretary of the United States Department of the Interior. I do not accept this argument either. The merits of plaintiffs' appeal were decided on June 16, 1989. The patent was not issued until June 23, 1989, *R., Vol. I at 322*, and it was not delivered or recorded until June 26, 1989, after the Assistant Secretary of Agriculture had declined to review the decision, *id.* Thus, plaintiffs have not shown how the patent violated 43 U.S.C. § 1718. If the Associate Deputy Chief or Assistant Secretary had decided in plaintiffs' favor, then the patent obviously would not have been delivered or recorded, for that was the entire purpose of the escrow arrangement.

In their ninth "claim for relief," plaintiffs allege an unlawful termination of a special use permit. Plaintiffs claim that, on June 23, 1989, the title company handling the closing mailed Vail (1) a proposed easement from Lodge Properties, and (2) a partial surrender and relinquishment of a special use permit in which Vail was asked to surrender all interest in a special use permit for a bike path. Plaintiffs allege that the termination of the Vail special use permit on the lodge parcel, the terms of the patent reservation relating to this permit, and the provisions of the easement offered to Vail violate 43 U.S.C.A. § 1766 (1986), which requires due notice for the termination of such rights. This argument is devoid of merit. The patent itself does not terminate the special use permit until December 31, 1989. Thus, the title company's delivery of the referenced documents on June 23, 1989, gave Vail notice and ample opportunity to contest the proposed termination of its rights.

Finally, I think that plaintiffs' sixth, seventh, eighth, and ninth "claims for relief" are essentially ancillary to their first, second, third, and fifth "claims." Had they prevailed on their main attack embodied in the earlier "claims," these additional "claims" might be treated as further equitable arguments supporting their overall effort to undo this entire exchange transaction. I am, however, upholding the agency's decision to proceed with the land exchange and its subsidiary determinations that the exchange is in the public interest, that land values have been equalized, and that the exchange has no significant environmental impact. I do not think that the related but distinct machinations designed to expedite closing of the transaction after the exchange received final approval—even if they were irregular and procedurally improper—would justify setting aside the decision to exchange the land. In light of this determination, it would be hollow to remand the ancillary machinations so that the agency could go through the exercise again. In other words, the determination that the land exchange decision was proper effectively moots the remaining arguments.

## C. *Lodge Properties' and Western Land's Motion to Dismiss and Motion for Summary Judgment*

The private defendants' motions essentially urge that, even if the administrative process were so capricious that the agency action should be set aside, Lodge Properties has received its land patent and cannot be divested of it. The motion goes to the heart of plaintiffs' eleventh claim for relief, which asks that the court undo the entire exchange transaction and require reconveyance of the lodge parcel to the United States. Because I am upholding the agency decision, there is no basis for the request that I undo the land exchange. Defendants' motions are therefore denied as moot.

## III.

## CONCLUSION

Upon the court's determination that there is no basis for setting aside any agency action in this case, it is

ORDERED that plaintiffs' case be dismissed.